PER CURIAM.—For the reasons stated in the foregoing opinion, the order appealed from is affirmed.

---

STATE, RESPONDENT, *v.* KEERL, APPELLANT.

(No. 1,993.)

(Submitted November 20, 1903. Decided February 1, 1904.)

*Criminal Law—Murder—Insanity — Instructions—Question for Jury—Information—Averment of Intent to Kill—Averment that Death Resulted from the Mortal Wounds Inflicted by Defendant—Conclusions of Pleader.*

1. An information for murder need not contain an express averment of an intent to kill.
2. An information for murder should directly allege that death resulted from the mortal wounds inflicted by defendant.
3. Averments concluding an information for murder, "and so the said [defendant] did kill and murder the said [deceased]," are merely conclusions of the pleader, and do not cure or aid a defective allegation of the cause of death.

4.   An information, after alleging the infliction—by the defendant upon the deceased—of certain mortal wounds, continued "of which said mortal wounds the said [deceased] did then and there languish, and languishing did live, and thereafter, on the 21st day of April, A. D. 1902, at the county of Lewis and Clarke, in the state of Montana, the said [deceased] died." *Disapproved* as not sufficiently charging that the deceased died from the mortal wounds inflicted by the defendant.

5.   On the issue of insanity in homicide, instructions that an insane delusion must be such that if things were as the person possessed of such delusion imagined them to be they would justify the act springing from the delusion, and that one suffering from a partial delusion was in the same situation as to responsibility as if the facts with respect to which the delusion existed were real, were radically wrong.

6.   In a prosecution for homicide, instructions on the issue of insanity based solely on the "right and wrong test" are in irreconcilable conflict with others based on that test as modified by the "irresistable impulse" test, and vitiate the conviction.

7.   In a prosecution for homicide, a charge stating that certain testimony is corroborative of other testimony is a comment on the weight of the evidence, and invades the province of the jury.

8.   In a prosecution for homicide, a charge stating that lunatics and insane persons are incapable of committing crimes, and if defendant was an insane person he should be acquitted, should have been qualified by adding after the words "insane person" a definition of the term "insanity," as used in criminal law.

9.   The question whether defendant was affected with insanity to such a degree as would excuse him from the commission of an act otherwise criminal is one of fact for the jury.

10.  Since Penal Code, Sections 20, 21, provide that in every crime there must exist a joint operation of act and intent, or criminal negligence, and that the intent is manifested by the circumstances of the offense and the sound mind and discretion of the accused, an insane person in criminal law is one who is mentally unable to form a criminal intent.

11.  On the question of insanity in homicide, the court should instruct in the language of the statute (Penal Code, Sections 20, 21), then define insanity as any weakness or defect of the mind rendering it incapable of entertaining in the particular instance the criminal intent, supplementing the definition by the comment that criminal responsibility is to be determined solely by defendant's capacity to conceive and entertain the intent to commit the particular crime, or similar language, and should not give further instructions, but should leave the fact to be determined by the jury.

Mr. Justice Holloway dissenting in part.

*Appeal from District Court, Lewis and Clarke County; Henry C. Smith, Judge.*

James S. Keerl was convicted of murder in the second degree. From the judgment, and from an order denying his motion for a new trial, he appeals. Reversed.

*Mr. T. J. Walsh,* and *Mr. C. B. Nolan,* for Appellant.

*Mr. James Donovan, Attorney General,* for the State.

MR. COMMISSIONER CALLAWAY prepared the opinion for the court.

The defendant has appealed from a judgment finding him guilty of murder in the second degree, and from an order denying his motion for a new trial. A number of errors are assigned.

1. He first attacks the information, which, omitting the formal parts, is as follows: "That at the County of Lewis and Clarke, in the State of Montana, on or about the 11th day of April, A. D. 1902, and before the filing of this information, the said James S. Keerl did, willfully, unlawfully, feloniously and of his deliberately premeditated malice aforethought, make an assault upon one Thomas Crystal, a human being and a certain pistol, commonly called a revolver, which was then and there loaded with gunpowder and leaden bullets, and by him, the said James S. Keerl, had and held in his right hand, he the said James S. Keerl, did then and there willfully, unlawfully, feloniously and of his deliberately premeditated malice aforethought shoot off and discharge at, upon and into the body of said Thomas Crystal, thereby and by thus striking the said Thomas Crystal with the said leaden bullets, inflicted upon the said Thomas Crystal certain mortal wounds in the back, side and head of the said Thomas Crystal (a more particular description of which said mortal wounds is to the county attorney unknown), of which said mortal wounds the said Thomas Crystal did then and there languish, and languishing did live, and thereafter, on the 21st day of April, A. D. 1902, at the county of Lewis and Clarke, in the state of Montana, the said Thomas Crystal died." The objections lodged against the information are: First. It does not contain an express averment of intent to kill. Second. It fails to allege that death resulted from the wounds inflicted.

The first objection must be overruled on the authority of *State* v. *Metcalf,* 17 Mont. 417, 43 Pac. 182, *State* v. *Northrup,* 13 Mont. 522, 35 Pac. 228, and *Territory* v. *Godas,* 8 Mont.

347, 21 Pac. 26. While the pleading in this respect must be held sufficient under the cases cited, this court has hitherto suggested that, as following a better practice, prosecuting officers should aver intent specially. (*Territory* v. *Godas, supra.*)

The second point urged presents more difficulty. After alleging the infliction of certain mortal wounds, the information continues, "of which said mortal wounds the said Thomas Crystal did then and there languish and languishing did live, and thereafter, on the 21st day of April, A. D. 1902, at the county of Lewis and Clarke, in the state of Montana, the said Thomas Crystal died."

An information must be direct and certain as regards the party charged, the offense charged, and the particular circumstances of the offense charged, when they are necessary to constitute a complete offense. (Penal Code, Sec. 1834.) It is not permissible to convict the defendant upon mere inferences; he must be directly, plainly and specifically charged with the commission of a certain crime, and it must be proved substantially as alleged in order to convict him. In order to convict an accused of murder, the fact of the killing by him as alleged must be proved beyond a reasonable doubt. (Penal Code, Sec. 358.) The fact that the defendant inflicted upon another human being a mortal wound deliberately, premeditatedly, with malice aforethought, and with the intent to kill the victim, is not sufficient to substantiate a charge of murder. The victim must die of the mortal wound, and within a year and a day after the stroke is received or the cause of death administered. (Penal Code, Sec. 357.) If the victim die of the mortal wound, but after a year and a day have elapsed since its infliction, the defendant may not be convicted of either murder or manslaughter. Neither can he be so convicted if, while the victim is languishing because of the mortal wound, death ensues from some cause not connected with or a consequence of the wound. For these reasons the information should directly allege that death resulted from the mortal wounds inflicted by the defendant. This view being so clearly correct in principle, it would seem that no cita-

tion of authorities is necessary, but see Clark on Criminal Procedure, 178; *People* v. *Lloyd,* 9 Cal. 55; *Commonwealth* v. *Macloon,* 101 Mass. 1, 100 Am. Dec. 89; *State* v. *Sundheimer,* 93 Mo. 311, 6 S. W. 52; Maxwell's Criminal Procedure, 180; Bishop's New Criminal Procedure, Secs. 527, 531, 532; Wharton's Criminal Law (10th Ed.), Sec. 536.

In *Lutz* v. *Commonwealth,* 29 Pa. 441, while an indictment containing language similar to the one at bar was sustained, the court say: "This indictment is not artistically expressed. Its grammatical construction is open to criticism, and it trenches hard on those rules of certainty which obtain in criminal pleading."

The attorney general relies on the concluding clause of the information as supplying the defect, because it alleges, "and so the said James S. Keerl did in the manner and form aforesaid willfully, unlawfully, feloniously and of his deliberately premeditated malice aforethought kill and murder the said Thomas Crystal." These words are the mere conclusion drawn from the preceding averments. If the averments are bad, the conclusion will not aid them; if they are good, and sufficiently describe the crime as the law requires, * * * the formal concluding words are immaterial." (*Territory* v. *Young,* 5 Mont. 244, 5 Pac. 248; *State* v. *Northrup,* 13 Mont. 522, 35 Pac. 228.)

We cannot give our approval to this information. As this case must go back for a new trial, the information may be amended by leave of the court to conform to the views herein expressed.

2. The defense interposed was that the defendant, when he committed the homicide, was affected with insanity. The defendant excepts to instructions Nos. 48, 50, 51, 52, 56 and 57, and alleges that 48, 51 and 52 are in conflict with 34, 38, 49, 53, 54 and 55. A discussion of a portion of those excepted to will be sufficient to dispose of the points raised. We quote 52, 56 and 57.

(52) "The standard of accountability is this: Had the defendant, at the time of the commission of the act, sufficient men-

tal capacity to appreciate the character and quality of the act? Did he know and understand that it was a violation of the rights of another, and in itself wrong? Did he know that it was prohibited by the laws of this state, and that its commission would entail punishment and penalties upon himself? If he had the capacity thus to appreciate the character and comprehend the possible or probable consequences of his act, he is responsible to the law for the act thus committed, and is to be judged accordingly."

(56) "The court further instructs you that, if you find that the accused was possessed of a delusion or delusions, you are carefully to bear in mind that it is not every delusion that can be considered an insane delusion. The delusion must be of such a character that, if things were as the person possessed of such delusion imagined them to be, they would justify the act springing from the delusion."

(57) "The court further instructs you that if you find the accused was possessed of a partial delusion only, and was not in other respects insane, then he must be considered in the same situation, as to responsibility, as if the facts with respect to which the delusion exists were real. For example, if, under the influence of his delusion, he supposed another man to be in the act of attempting to take away his life, and he killed that man, as he supposed, in self defense, he would be exempt from punishment; but if his delusion was that the deceased had done a serious injury to his character or person, and he killed him in revenge for such supposed injury, he would be liable to punishment."

These instructions bring us to a realm in which the investigator feels himself lost in a labyrinth of conflicting decisions. Of course, any discussion of the principles applicable to insanity as a defense to crime must necessarily be limited to the particular case in hand. As to what extent juries should be instructed upon this subject and the subject-matter of such instructions is of the greatest importance. Some general rules have always been, and must be, laid down by the courts for the

guidance of juries in trials of this character. This view is universally adopted; the only question is, what rule or rules should be adopted, and should the courts lay down any *test?* The tests of insanity generally adopted by the courts are the right and wrong test, the irresistible impulse test, the right and wrong test as regards the particular act, and the right and wrong test as modified by the irresistible impulse test. The Supreme Court of New Hampshire denies the existence of any test. (*State* v. *Pike,* 49 N. H. 399, 6 Am. Rep. 533; *State* v. *Jones,* 50 N. H. 369, 9 Am. Rep. 242.)

A majority of the courts seem to follow the right and wrong test laid down in *McNaghten's Case.* 10 Clark & Finnelly, 200; 1 C. & K. 47 Eng. C. L. Rep. 129; 8 Eng. Rep. Full Print, 718. For this reason, and because instructions 52, 56 and 57 are based upon the doctrines enunciated in that celebrated case, we are justified in discussing it at some length. We shall do so with special reference to instructions 56 and 57. In 1843 Daniel McNaghten was tried for the murder of Edward Drummond. At his trial medical testimony was adduced showing that McNaghten was of unsound mind at the time of the killing; that he suffered from morbid delusions; that a person so laboring under a morbid delusion might have a moral perception of right and wrong, but that in the case of the prisoner it was a delusion which carried him away beyond the power of his own control, and left him no such perception; and that he was not capable of exercising any control over acts which had connection with his delusion. The prisoner was acquitted, but public feeling ran so high in consequence that the house of lords asked the opinion of the judges on the law governing such cases. Three of the five questions propounded were: "(2) What are the proper questions to be submitted to the jury when a person alleged to be afflicted with insane delusion respecting one or more particular subjects or persons is charged with the commission of a crime (murder, for example), and insanity is set up as a defense? (3) In what terms ought the question to be left to the jury as to the prisoner's

state of mind at the time when the act was committed? (4) If a person under an insane delusion as to existing facts commits an offense in consequence thereof, is he thereby excused?" To the second and third questions the judges answered "that to establish a defense on the ground of insanity it must be clearly proved that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." To the fourth question they answered: "Making the same assumption as we did before, namely, that he labors under a partial delusion only, and is not in other respects insane, we think he must be considered in the same situation as to responsibility as if the facts, with respect to which the delusion exists, were real. For example, if, under the influence of his delusion, he supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defense, he would be exempt from punishment. If his delusion was, that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge for such supposed injury, he would be liable to punishment."

Dr. Clevenger, in discussing this case, says: "Great ignorance of the nature of insanity is displayed in these answers, which seem to have been constructed with special reference to the popular wishes in the particular instance of McNaghten's offense;" and then follows with an illustrative criticism in which he demonstrates the absurdity of the abstract right and wrong test, as well as the dangerous and inhuman doctrine enunciated in that part of *McNaghten's Case* which refers to insane delusions. (Clevenger's Medical Jurisprudence of Insanity, 19 *et seq.*)

One of the most learned discussions on this subject is by Mr. Justice Somerville, in *Parsons* v. *State,* 81 Ala. 577, 2 South. 854, 60 Am. Rep. 193. From that opinion we quote with approval the following language: "If the rule declared

by the English judges be correct, it necessarily follows that the only possible instance of excusable homicide in cases of delusional insanity would be where the delusion, if real, would have been such as to create in the mind of a reasonable man a just apprehension of imminent peril to life or limb. The personal fear or timid cowardice of the insane man, although created by disease acting through a prostrated nervous organization, would not excuse undue precipitation of action on his part. Nothing would justify [excuse?] assailing his supposed adversary except an overt act or demonstration on the part of the latter, such as, if the imaginary facts were real, would under like circumstances have justified [excused?] a man perfectly sane in shooting or killing. If he dare fail to reason, on the supposed facts embodied in the delusion, as perfectly as a sane man could do on a like state of realities, he receives no mercy at the hands of the law. It exacts of him the last pound of flesh. It would follow also, under this rule, that the partially insane man, afflicted with delusions, would no more be excusable than a sane man would be, if, perchance, it was by his fault the difficulty was provoked, whether by word or deed; or if, in fine, he may have been so negligent as not to have declined combat when he could do so safely, without increasing his peril of life or limb. If this has been the law heretofore, it is time it should be so no longer. It is not only opposed to the known facts of modern medical science, but it is a hard and unjust rule to be applied to the unfortunate and providential victims of disease. It seems to be little less than inhuman, and its strict enforcement would probably transfer a large percentage of the inmates of our insane hospital from that institution to hard labor in the mines or the penitentiary. Its fallacy consists in the assumption that no other phase of delusion, proceeding from a diseased brain, can so destroy the volition of an insane person as to render him powerless to do what he knows to be right, or to avoid doing what he may know to be wrong."

We therefore think that instructions 56 and 57 are radically wrong, and should never be given.

3. Now, taking up 52. Defendant's counsel especially object to this instruction, because it does not recognize that the defendant may have acted under an irresistible impulse caused by mental disease.

It seems to be demonstrated by modern investigation, beyond cavil, that many insane persons, while having the mental capacity to distinguish between right and wrong, are not able to choose between doing what is right and doing what is wrong. The lower court recognized this in instructions 34, 38, 49, 53, 54 and 55. As illustrative of this, we quote a portion of 38: "If, by reason of disease affecting his mind, his mental faculties were so impaired or perverted as that he was unable to distinguish between right and wrong as to the particular act with which he is charged; or if he was able to recognize that it was wrong, and yet was impelled by some impulse, originating in disease, to the commission of the act, and was unable by reason of the diseased condition of his mind, enfeebling his will or otherwise, to refrain from its commission—he should be acquitted by reason of insanity." This proposition was also recognized in *State* v. *Peel,* 23 Mont. 358, 59 Pac. 169, 75 Am. St. Rep. 529, in which the court, speaking through Mr. Chief Justice Brantly, says: "One may have mental capacity and intelligence sufficient to distinguish between right and wrong with reference to the particular act, and to understand the consequences of its commission, and yet be so far deprived of volition and self-control, by the overwhelming violence of mental disease, that he is not capable of voluntary action, and therefore not able to choose the right and avoid the wrong."

Instruction 52 is based upon what is called the right and wrong test, which does not recognize that the accused may have been involuntarily impelled to the commission of an act from which he was mentally unable to refrain, and therefore is in conflict with instructions 34, 38, 49, 53, 54 and 55, which are based upon the right and wrong test as modified by the irresistible impulse test. In the *Peel Case* the court suggested that, in a case in which there is *no pretense that the party cannot*

*control his own actions,* it may be proper to apply the right and wrong test. We thus see that the lower court gave to the jury two different tests by which the defendant's responsibility for crime might be determined as *the* test to be followed by them. These tests are based upon different theories, and consequently upon different states of fact, and the two are irreconcilable. If instructions 34, 38, 49, 53, 54 and 55 were applicable to the facts in the case, 48, 51 and 52 could not be; the three latter excluded from the jury any consideration of the question whether, under the evidence, the defendant acted under an insane irresistible impulse. When instructions are conflicting upon a material issue, the judgment cannot stand. (*State* v. *Rolla,* 21 Mont. 582, 55 Pac. 523; *State* v. *Sloan,* 22 Mont. 293, 56 Pac. 364; *State* v. *Peel,* 23 Mont. 358, 59 Pac. 169, 75 Am. St. Rep. 529; *State* v. *McClellan,* 23 Mont. 532, 59 Pac. 924, 75 Am. St. Rep. 558.)

4.   Defendant also attacks instruction No. 50, on the ground that it comments upon the weight which is to be given to certain items of the testimony. So much of the instruction as is criticised reads:   " 'That subtle essence which we call "mind" defies, of course, ocular inspection. It can only be known by its outward manifestations, and they are found in the language and conduct of the man. By these his thoughts and emotions are read, and according as they conform to the practice of people of sound mind, who form the large majority of mankind, or contrast harshly with it, we form our judgment as to his soundness of mind. For this reason evidence is admissible to show conduct and language, at different times and on different occasions, which indicate to the general mind some morbid condition of the intellectual powers; and the more extended the view of the person's life, the safer is the judgment formed of him. Everything relating to his physical and mental history is relevant, because any conclusions as to his sanity must often rest upon a large number of facts. As a part of the language and conduct, letters spontaneously written afford one of the best indications of mental condition. Evidence as to insanity

in the parents and immediate relatives is also pertinent. It is never allowed to infer insanity in the accused from the mere fact of its existence in the ancestors. But when testimony is given directly tending to prove insane conduct on the part of the accused, this kind of proof is admissible as corroborative of the other. And therefore it is that the defense has been allowed to introduce evidence to you covering the whole life of the accused and reaching to his family antecedents.' "

This instruction was taken from the charge of Judge Cox to the jury in the *Guiteau Case* (10 Fed. 161). In the United States courts the judges are permitted to comment upon and explain the testimony of the witnesses, but such is not the rule in this jurisdiction. The instruction is certainly open to defendant's criticism. For instance, the jury is first told that "it is never allowed to infer insanity from the mere fact of its existence in the ancestors," and is then instructed, "but, when testimony is given directly tending to prove insane conduct on the part of the accused, this kind of proof is admissible as corroborative of the other." When the court told the jury that certain evidence was corroborative, it commented on the weight of that testimony. In this the court erred. It is the sole province of the jury to weigh each item of the testimony, and to give it such credit as they believe it entitled to. (*State v. Sullivan,* 9 Mont. 174, 22 Pac. 1088; *State v. Gleim,* 17 Mont. 17, 41 Pac. 998, 31 L. R. A. 294, 52 Am. St. Rep. 655; *State v. Mason,* 24 Mont. 340, 61 Pac. 861.)

5: While we have not passed upon the correctness of any instructions in this case which have not been argued by counsel, we call the court's attention to 32, 33 and 36. No. 32 reads: "Under the law of this state certain persons, including lunatics and insane persons, are incapable of committing crimes. Accordingly, if you find that, at the time of the doing of the acts charged in the information against the defendant, he was an insane person, it is your duty to acquit him on the ground of insanity." After the words "an insane person" the court should have explained the meaning of the term "insanity," as it is

regarded in the criminal law, either by direct definition or by reference to other parts of the charge. It is not sufficient to give the statute without explanation, because it is not every form of insanity which will excuse the defendant of the act committed.

6. The disease of insanity is subject to so many different phases, which are manifested in so many different ways—as various as human thought—that each case must stand upon its own facts. A court, therefore, cannot instruct the jury on every phase or manifestation of insanity, nor should it attempt to; the instructions should be as brief and simple as it is possible to make them. It should only declare generally upon the subject, and it must be left to the jury to find from the proof upon the issue of insanity.

The question whether the defendant in any case was affected with insanity to such a degree as will excuse him from the commission of an act which would be criminal if done by a sane person is one of fact; it certainly is not a question of law. When a defendant sets up insanity as a defense, laymen, and experts on insanity, are permitted to testify upon the question of his sanity, under the rules of evidence. Upon the testimony adduced the jury is to find the defendant guilty, or not guilty, by reason of insanity. What persons, then, are insane within the purview of the criminal law? Manifestly, those who are mentally unable to form a criminal intent. The Penal Code declares:

"Sec. 20. In every crime or public offense there must exist a union or joint operation of act and intent, or criminal negligence.

"Sec. 21. The intent or intention is manifested by the circumstances connected with the offense, and the sound mind and discretion of the accused. All persons are of sound mind who are neither idiots nor lunatics, nor affected with insanity."

For the purposes of this discussion, we shall treat insanity and lunacy as synonymous terms. What, then, is insanity in a legal sense? Mr. Bishop gives the following definition: "In-

sanity, in the criminal law, is any defect, weakness, or disease of the mind rendering it incapable of entertaining, or preventing its entertaining, in the particular instance, the criminal intent which constitutes one of the elements of every crime." (1 Cr. Law, Sec. 381, Subd. 2.) "Criminal responsibility is to be determined solely by the capacity of the defendant to conceive and entertain the intent to commit the particular crime. If there is no intent, there is no crime." (*State* v. *Peel, supra.*) In the *Peel Case* the court did not attempt to lay down any test; it was merely discussing the case presented to it. It gave its approval to instructions 36 and 37 quoted in the opinion, saying that upon that branch of the case the lower court instructed the jury fully and fairly. It will be observed that instruction 37 dealt wholly with the question of the defendant's intent. That the instructions last mentioned were correct in the *Peel Case* is undoubted.

It is worthy of remark that juries must be composed of men of a very high order of intelligence if they are much enlightened —indeed, if they are not badly confused—by the mass of instructions usually given them by the courts in insanity cases. Instructions are given to enlighten a jury, not to confuse it. (*Yoder* v. *Reynolds,* 28 Mont. 183, 72 Pac. 417.)

Recognizing the general doctrines asserted in the *Peel Case* as correct, we are of the opinion that the result sought to be obtained, to-wit, a solution of the question whether the defendant, when he committed the act for which he is on trial, had the mental power to entertain a criminal intent, and did entertain it, can be reached best by submitting to the jury a test founded solely upon the statute. The question for determination being, was the defendant, when he committed the act, sane, or affected with insanity? the court should give to the jury the appropriate sections of the statute, at the same time defining insanity in accordance with Bishop's definition, as supplemented by this court's comment thereon in the *Peel Case,* or make use of equivalent language. We doubt if any other or further instructions on the subject of insanity are necessary or useful. (*State* v.

*Pike, supra; State* v. *Jones, supra.*)   The jury may determine the fact from the testimony adduced before it, no matter what may be the character of the insanity attributed to the defendant. This includes, of course, insane delusions and insane irresistible impulses.   To illustrate:  If the defendant, when he committed the act which would be criminal if done by a sane person, did not know the difference between right and wrong, or, knowing it, was mentally unable to refrain from doing the wrong, he was incapable of forming the criminal intent; or if he was so mentally diseased that he was under the overmastering influence of a delusion which obliterated his power to refrain from the commission of the wrongful act, he was incapable of forming the criminal intent.

In a case where insanity is urged as a defense, the particular technical phase of insanity from which the defendant suffered when he committed the act (if he was in fact insane) is utterly immaterial to the jury; they do not know nor care what the alienists may call it; their desire should be, and their duty is, to ascertain whether the defendant committed the act with a criminal intent; if he did, he is guilty; if he did not, he is not guilty by reason of insanity.

For the foregoing reasons we are of the opinion that the judgment and order should be reversed, and the cause remanded for a new trial in conformity with the views herein expressed.

PER CURIAM.—For the reasons given in the foregoing opinion, the judgment and order are reversed, and the cause is remanded for a new trial.

MR. JUSTICE HOLLOWAY:  I am unable to agree with much that is said in the foregoing opinion.   In my judgment, conflicting doctrines on the subject of insanity are announced in *State* v. *Peel,* 23 Mont. 358, 59 Pac. 169, 75 Am. St. Rep. 529, and, if it is intended in this instance to approve what is said in that decision upon this subject, great difficulty must necessarily be experienced upon a re-trial of this cause.

In my opinion, instructions 56 and 57 are erroneous.

Instruction No. 50 does not state correct principles of law, and the court therein comments on the weight of the evidence. For these reasons, I think it should not be given at all.

I am also unable to reconcile the doctrine announced in *State* v. *Pike,* 49 N. H. 399, 6 Am. Rep. 533, and *State* v. *Jones,* 50 N. H. 369, 9 Am. Rep. 242, which I think correct, and which seems to be approved, with what is said in other portions of the opinion of the majority of the court.

However, without attempting any discussion of the subject, I content myself with concurring in the order reversing the judgment, but do so upon the grounds that conflicting instructions upon a material issue were given, and that the court gave instructions 50, 56 and 57, above.

Rehearing denied February 24, 1904.