## STATE, RESPONDENT, *v.* WALLIN, APPELLANT.

### (No. 4,625.)

(Submitted June 2, 1921.   Decided June 20, 1921.)

[199 Pac. 285.]

*Criminal Law—Grand Larceny—Banks and Banking—Trusts —Bailment—Information—Evidence — Insufficiency — Criminal Intent.*

Grand Larceny—Ownership of Property—Evidence—Insufficiency.
   1.  In a prosecution for grand larceny the information charged defendant, while acting as cashier of a bank, with having stolen a Liberty Bond, the property of one L. and purchased by him on the installment plan.  The bond was one of a number subscribed for by the bank to a reserve bank and held in trust for the individual subscribers until full payment therefor was made by them.  *Held,* that title to the bond in question was in the bank, and did not pass to L., under section 4632, Revised Codes, until it was identified on delivery to L. upon final payment, and that, therefore, at the time of the alleged offense, several months prior to delivery, he was not the owner thereof.

Same—Property in Defendant's Possession by Virtue of Office—Information—Insufficiency.
   2.  An information charging that, while acting as cashier of a bank, defendant feloniously converted a Liberty Bond to his own use, was insufficient for failure to allege that the bond came into his possession by virtue of his office.

Bailment—Ownership of Property in Whom.
   3.  In bailment, the ownership of the chattel is in the bailor, and the possession only in the bailee.

Trusts—Personal Property—Legal Title, in Whom.
   4.  In a trust of personal property, the legal title is in the trustee.

Grand Larceny by Bailee—Evidence—Insufficiency.
   5.  Where the legal title to a bond was in a bank as trustee and in the possession of it in the cashier only by virtue of his office, a prosecution against the latter under subdivision 2 of section 8642, Revised Codes, under a charge of larceny by bailee, could not be maintained.

Same—Criminal Intent—Evidence—Insufficiency.
   6.  Since, to constitute the crime of larceny there must have been a criminal intent to permanently deprive the owner of the property taken, evidence showing that defendant cashier delivered a Liberty Bond held in trust by his bank for a subscriber, in behalf of his bank, as collateral security to another bank, with the intention that

----

6.  On the question of intent or offer to return, or actual return of, property as affecting charge of embezzlement or larceny, see notes in **Ann. Cas.** 1916C, 90; 52 **L. R. A. (n. s.)** 1013.

[60 Mont. 332.]

it should be redeemed within a short time, which was done before
the information against him for larceny was filed, *held* insufficient to
support a verdict of guilty.

Criminal Law—Conviction for Crime not Charged Unauthorized.

7. Conviction cannot be had of one offense upon an information
which charges an entirely distinct and unrelated crime.

*Appeals from District Court, Rosebud County; George P.
Jones, Judge.*

W. J. WALLIN was convicted of grand larceny and appeals
from the judgment and order denying a new trial. Reversed
and remanded, with directions to dismiss the information and
discharge the defendant.

Cause submitted on brief of Appellant.

*Mr. C. H. Loud* and *Messrs. Nichols & Wilson,* for Appel-
lant.

Taking the property of another, with intent to pledge the
same, amounts to taking *animo furandi,* if there be no rea-
sonable likelihood of ability to redeem, or if the intention to
redeem be only a vague and indefinite one. But one who
pledges borrowed property, with the intention of redeeming
and restoring it to the owner, and having a fair and reasonable
expectation of so doing, is not guilty of larceny. (25 Cyc.
47, 48; *Regina* v. *Phetheon,* 9 Car. & P. 552; *Blackburn* v.
*Commonwealth* (Ky.), 89 S. W. 160.) "Where defendant,
having borrowed a diamond ring, pawned it with intent to re-
deem it, and without any intent to permanently deprive the
owner of the property, he was not guilty of theft as bailee;
the fraudulent intent existing at the time of the conversion
being an essential element of the offense." (*Taylor* v. *State,*
50 Tex. Crim. 377, 97 S. W. 473; *State* v. *Ward,* 96 Wash.
550, 165 Pac. 794.) In *Valley Mercantile Co.* v. *St. Paul F.
& M. Ins. Co.,* 49 Mont. 430, Ann. Cas. 1916A, 1126, L. R. A.
1915B, 327, 143 Pac. 559, this court said: "To constitute the
crime of larceny the intent which accompanies the act of taking
must be the criminal intent to deprive the owner of his prop-

[60 Mont. 332.]

erty, not temporarily but permanently." (See, also, *People* v. *Brown*, 105 Cal. 66, 38 Pac. 518.)

The intent with which an act is done is a mental condition. It is often difficult of proof, and a denial of criminal intent may easily be made. Because of this, and the fact that in the majority of cases there is a more or less weak desire and intention to make return, the rule has in some jurisdictions been settled by statute. In some states the offer to return and actual return does not bar a prosecution. In others the evidence is received on the question of intent, and in some that restoration is not a defense unless made before information is filed. (20 C. J. 455, 456.)

Montana has adopted the latter rule and it is embodied in section 8658, Revised Codes. If the fact of intention to restore is no ground of defense, where the property has not been restored prior to filing information, then the correlative must be true: that the fact of intention to restore is a ground of defense where the property has been restored prior to filing information. The intention to restore must, of course, be one held in good faith; but if so, and it further appears that restoration has been made before filing complaint, then the defense is good, for the defendant had then no criminal intent and the crime was not committed.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

The defendant was convicted of grand larceny, and appealed from the judgment and from an order denying him a new trial.

Paraphrased, the information charges that on December 20, 1918, the defendant, while acting as cashier of the Rosebud State Bank, and having in his possession as bailee a United States Liberty Bond, No. 673169, of the value of $500, and the property of Hugh Lynch, did feloniously appropriate the said bond to his own use, with intent to deprive the true owner of his property.

[60 Mont. 332.]

Counsel for defendant make twenty-four assignments of error predicated upon the rulings upon the admission of evidence, the giving and refusal of instructions, the refusal of the court to advise the jury to acquit, and the refusal to grant a new trial. These assignments need not be considered separately. Most of them, in one form or another, present the question of the correctness of the theory upon which the prosecution proceeded.

During the summer of 1918 the campaign was conducted throughout the country for sale of bonds of the Third Liberty Loan. The general plan of that campaign is a matter of public history, and need not be considered. In and about the town of Rosebud, subscriptions were obtained by the card system in use. Each of several subscribers indicated that he would make payment on his subscription to the Rosebud State Bank, of which institution the defendant was cashier and active manager. When these particular cards were collected, they were turned into the bank which made its subscription to the Federal Reserve Bank at Minneapolis for bonds of the denominations and in the aggregate amount corresponding to the individual subscriptions. Each subscriber to one of these cards agreed to purchase the bond, or bonds, indicated, and to pay into the Rosebud State Bank the face value thereof, either in a lump sum or by the installments authorized by the government. The bank, by its subscription, agreed likewise with the Federal Reserve Bank to purchase the bonds indicated by its subscription, and to pay therefor upon the installment plan. The bank made its several payments, and received the bonds into its custody. It is not made certain by the record whether every individual subscriber fully paid his subscription into the bank. It does appear that many of them did not pay promptly as the installments became due, and that the bank was compelled to advance the money; but for the purpose of this case we may assume that everyone met his obligations by the time the bonds were received by the Rosebud Bank.

Hugh Lynch subscribed for one $500 bond of this issue, and indicated upon his card that payment would be made therefor to the Rosebud Bank, in which institution he then had on deposit sufficient money to pay his subscription in one payment, but he did not give special directions as to the manner of payment, except that the bank was authorized to deduct from his deposit the amount or amounts necessary to discharge his subscription obligations. As a matter of fact, the bank employed the installment plan, and charged Lynch's account with deductions which in the aggregate equaled the total of his subscription, the last deduction having been made in August, 1918. On November 15, 1918, the Rosebud State Bank was indebted to the First National Bank of Miles City on an overdraft in the sum of $60,000 in round numbers, and demand was then made that it be covered at once. To this end it was agreed between the two institutions that satisfactory securities should be sent by the debtor to the creditor bank. About November 17 the Rosebud Bank, acting through this defendant as cashier, sent its three promissory notes to the Miles City Bank, one note for $17,650, to which were attached as collateral Liberty Bonds of the aggregate value of the face of the note; one note for $24,017.08, with warrants of that value attached as collateral security; and one note for $23,332.92, with bills receivable attached as collateral. The purpose of the Rosebud Bank was to secure a loan from the Miles City Bank for $65,000, pay out of this its overdraft, and leave a small credit balance in its favor. At the time these securities were forwarded, entries were made upon the books of the Rosebud Bank. The Miles City Bank's account was charged with $65,000 and bills payable credited with a like amount. Two or three days later the Miles City Bank notified the Rosebud Bank that it declined to make the loan for $65,000, but that it had applied the bonds and warrants as cash items toward the payment of the overdraft, and had retained the bills receivable as collateral for the balance, with the right in the Rosebud Bank to withdraw the bonds and

warrants at any time upon paying the face value thereof, with interest at eight per cent per annum. Some days later the Rosebud Bank's three notes were returned to it. On November 26, after receipt of a reconcilement from the Miles City Bank disclosing the then status of the Rosebud Bank's account with it, the assistant cashier of the Rosebud Bank entered upon the books of that bank a credit to the Miles City Bank's account of $23,332.92; that being the difference between $65,000 and the aggregate face value of the bonds and warrants. On December 19 or 20 defendant made entries upon the Rosebud Bank's books, as follows: The warrant account was credited with $27,469.36; the Miles City Bank's account was charged with $3,452.28—apparently the accrued interest on the warrants—and the bills payable account was charged with $24,017.08. This still left a credit of $17,650 in favor of the Rosebud Bank, but with no corresponding entries upon its books showing the proper, or any, disposition of that amount. To make up entries covering this item, the defendant at the same time charged the bills payable account with $17,650, designating opposite the entry, M. C. L. Bonds, meaning Miles City Liberty Bonds. To balance this entry, defendant credited the loans and discounts account with $9,386.71, the interest account with $238, and withdrew from the note file of the bank the note of J. F. Edgerton for $1,780, with interest due, $178; the note of C. L. Bachelor for $6,406.71; the note of McRae and Wallin for $1,200, with interest due, $60; and also credited individual deposit accounts as follows: W. J. Wallin, $5,760.78; Mrs. O. B. Jentry, $100; O. B. Jentry, $700; O. B. Jentry, $64.51, "Lumpy Jaw"; B. J. Jentry, $1,400. In May, 1919, the superintendent of banks made an official examination of the Rosebud Bank during the absence of the defendant, and at that time the Edgerton note and the McRae-Wallin note were found locked in the defendant's desk. In June, 1919, the Liberty Bonds were redeemed from the Miles City Bank, returned to the Rosebud Bank, and there-

after, upon demand, were delivered to the subscribers according to their respective subscriptions.

The information herein was filed February 11, 1920. The allegations of that information material to a determination of questions presented by these appeals are: (1) That on December 20, 1918, Hugh Lynch was the owner of Liberty Bond No. 673169; (2) that defendant then had the bond in his possession, custody, or control as bailee; and (3) that defendant then converted the bond to his own use with the felonious intent to deprive the true owner of his property. The evidence, as exhibited by the foregoing résumé, fails to prove, and does not even tend to prove, any one of these allegations.

1. Notwithstanding Lynch's testimony that on December 20, [1] 1918, he owned the particular bond No. 673169, the record discloses that he did not. When he completed payment of his subscription, he was entitled to receive one $500 bond. If there had been but one $500 bond in the lot received by the Rosebud Bank from the Federal Reserve Bank, and Lynch had been the only subscriber for a $500 bond, it might be argued with some show of reason that the delivery of that bond to the Rosebud Bank was a sufficient identification to pass title to Lynch; but the record discloses affirmatively that there was at least one other $500 bond (No. 673168) in the lot, and how many more does not appear. About June 1, 1919, after the bonds were returned from Miles City, Mr. Kennedy, the assistant cashier of the Rosebud Bank, delivered bond No. 673169 to Hugh Lynch. When, then, did title to this particular bond pass to Mr. Lynch? Section 4632 of the Revised Codes provides: "The title to personal property, sold or exchanged, passes to the buyer whenever the parties agree upon a present transfer, and the thing itself is identified, whether it is separated from other things or not." So far as disclosed by this record, there never was any identification of this bond as the property of Lynch until the day it was delivered to him, six or seven months after the alleged offense was committed,

and until there was such identification, the title could not pass. (*Adlam* v. *McKnight*, 32 Mont. 349, 80 Pac. 613.)

But there is a stronger reason for our conclusion. Lynch's subscription amounted to an offer to purchase one $500 bond. The bank's subscription for the total of the individual subscriptions constituted an offer to purchase, and a promise to pay for, those bonds, which, upon acceptance by the government, became a binding contract (sec. 5084, Rev. Codes), and upon the completion of payment by the Rosebud Bank and the delivery of the bonds by the government a sale was consummated. The legal title then passed from the government to the Rosebud Bank in trust, however, for the individual subscribers to the extent of their respective subscriptions completed by payment to the bank. Notwithstanding the fact that the bank was trustee, it held the legal title to these bonds until the trust was executed by the delivery of the bonds to the individual subscribers in June, 1919, and it was in the actual possession of them until they were delivered to the Miles City Bank. Under no circumstances, therefore, can it be said that Lynch was the owner of the particular bond No. 673169 on December 20, 1918.

2. Was the defendant in his individual capacity in possession of this bond as bailee? From the recital of the evidence above, it is manifest at once that the inquiry must be answered in the negative. The record discloses that the only possession which defendant ever had was by virtue of his office as cashier of the bank. The information charges that, "while acting as the cashier of the Rosebud State Bank," defendant converted this bond to his own use. The words "while acting as the cashier of the Rosebud State Bank" are meaningless in the connection in which they are employed. If it was sought to charge defendant with the larceny of this bond while in his custody by virtue of his office as cashier, under section 8656, Revised Codes, the information is insufficient in failing to allege that it came into his possession by virtue of his office. (*Moore* v. *United States,* 160 U. S. 268,

40 L. Ed. 422, 16 Sup. Ct. Rep. 294 [see, also, Rose's U. S. Notes]; *State* v. *Winstandley,* 154 Ind. 443, 57 N. E. 109.) [3] This, however, was not the theory of the state, for without objection the court instructed the jury that the prosecution was being conducted under subdivision 2, section 8642, which has to do only with the larceny of property in the possession of the defendant in his individual capacity as agent, *bailee, etc.* But neither the bank nor the defendant was a [4, 5] bailee in this instance. In bailment, the ownership is in the bailor, and the possession only in the bailee. (6 C. J. 1106.) In a trust of personal property, the legal title is in the trustee, and the possession may be in him likewise. (39 Cyc. 76.)

3. The evidence likewise fails to prove, or tend to prove, [6] that the defendant feloniously, or at all, converted this bond to his own use, or to the use of anyone else. It may be true that he was guilty of a breach of trust in pledging these bonds to the Miles City Bank as collateral security for the loan which he sought for the Rosebud Bank, and it may be equally true that the Miles City Bank was without authority to apply these bonds to a different purpose from that for which they were delivered. But these considerations are inconsequential so far as the question now presented is concerned. The evidence goes no further than to prove that the bonds were delivered to the Miles City Bank as collateral security with the intention, on the part of the Rosebud Bank and the defendant, that they should be redeemed within a short time. In *Valley Mercantile Co.* v. *St. Paul F. & M. Ins. Co.,* 49 Mont. 430, Ann. Cas. 1916A, 1126, L. R. A. 1915B, 327, 143 Pac. 559, this court said: "To constitute the crime of larceny, the intent which accompanies the act of taking must be the criminal intent to deprive the owner of his property, not temporarily, but permanently." And we also quoted with approval from *People* v. *Brown,* 105 Cal. 66, 38 Pac. 518, the following: "But the test of law to be applied to these circumstances for the purpose of determining the ultimate fact as to the man's guilt or innocence is: Did he intend to permanently

deprive the owner of his property? If he did not intend so to do, there is no felonious intent, and his acts constitute but a trespass. While the felonious intent of the party taking need not necessarily be an intention to convert the property to his own use, still it must in all cases be an intent to wholly and permanently deprive the owner thereof.'' Furthermore, this theory of the law is borne out by our statute. Section 8658, Revised Codes, provides: ''Upon an indictment, information or complaint for larceny it is a sufficient defense that the property was appropriated openly and avowedly under a claim of title preferred in good faith, even though such claim is untenable. The fact that the defendant intended to restore the property taken is no ground of defense if it has not been restored before complaint, to a magistrate or court, charging the commission of the offense, has been made.'' As indicated above, these bonds were returned to the Rosebud Bank before any demand was made for them by subscribers, and several months before the information herein was filed.

Numerous errors were committed in the trial of this case which require a reversal of the judgment. We have extended our inquiry in order to determine whether a new trial should [7] be ordered. Whatever may be said in condemnation of defendant's fraudulent banking as disclosed by the record of the entries made by him after the Liberty Bonds were sent to Miles City, it is apparent that he is not guilty of the particular offense with which he is charged, and that it would be idle to direct a new trial. It is elementary that a party cannot be convicted of one offense upon an information which charges a distinct and unrelated crime.

The judgment and order are reversed, and the cause is remanded to the district court of Rosebud county, with directions to dismiss the information and discharge the defendant.

*Reversed.*

Mr. Chief Justice Brantly and Associate Justices Reynolds, Cooper and Galen concur.