STATE, RESPONDENT, *v.* RAREY, APPELLANT.

(No. 5,611.)

(Submitted January 10, 1925. Decided February 7, 1925.)

[233 Pac. 615.]

*Criminal Law—Grand Larceny—Banks and Banking—Informa-
tion—Insufficiency.*

Banks and Banking—Deposits—Relationship of Depositor With Bank.
1.  One depositing money in a bank parts with title to the specific
money deposited; it then becomes the property of the bank sub-
ject to his demand for repayment, he becoming a general creditor
of the bank in the amount deposited.

Same—Fraudulent Transfer of Credits on Books of Bank not Grand
Larceny.
2.  Defendant, a bank officer, whose personal account with the
bank was overdrawn, drew a draft on another bank and credited
his account with the amount thereof; the draft was returned un-
paid and he then charged it to the account of one of the bank's
depositors.  No actual money was taken and the cash account of
the bank was not diminished.  *Held*, that while defendant may
have been guilty of falsifying the books of the bank or of mis-
application of a credit belonging to another his act did not con-
stitute larceny from the bank as charged in the information.

Criminal Law—What Necessary to Conviction.
3.  Before one may be convicted, he must be directly, plainly and
specifically charged with the commission of a certain crime and the
crime charged must be proved substantially as charged.

*Appeal from District Court, Big Horn County; Robert C.
Stong, Judge.*

BERT RAREY was convicted of grand larceny and appeals from
the judgment and an order denying him a new trial.  Reversed,
with directions to dismiss the information.

*Mr. Charles J. Dousman, Mr. T. H. Burke* and *Messrs. Camp-
bell & Carolan,* for Appellant, submitted a brief; *Mr. Donald
Campbell* argued the cause orally.

In the case at bar a variance occurs between the allegations
of the information and the proof introduced in two particulars,

2.  What constitutes larceny, see notes in 57 **Am. Dec.** 27; 30 **Am. Rep.**
159; 88 **Am. St. Rep.** 559.

(a) the thing alleged to have been stolen, and (b) the owner-
ship of the property or thing alleged to have been stolen.

The information charges the theft of money, and the
proof, if it shows the theft of anything, shows the theft of a
species of property other than money, to-wit, credits.

Money is not included in any authorized definition of the
word "credits." (*Pullman State Bank* v. *Manring,* 18 Wash.
250, 51 Pac. 464; *Wasson* v. *First Nat. Bank,* 107 Ind. 206, 8
N. E. 97; *United States* v. *Smith,* 152 Fed. 542.)

The universal rule seems to be that one charged with the
larceny of money cannot be convicted upon proof of the theft
of a check, draft, promissory note or other instrument of
that nature. (*People* v. *Arnold,* 20 Cal. App. 35, 127 Pac.
1060.)

That an information for the conversion of money does
not cover the conversion of a check was decided by the
supreme court of Alabama in the case of *Carr* v. *State,* 104
Ala. 43, 16 South. 155. Other cases bearing on the question
of the conversion of a check where the charge in the indict-
ment was the larceny of money are as follows: *Lancaster* v.
*State,* 9 Tex. App. 393; *State* v. *Rosefelt* (Mo. App.), 184
S. W. 904; *State* v. *Castleton,* 255 Mo. 201, 164 S. W. 492;
see, also, *Statum* v. *State,* 9 Tex. App. 273; *State* v. *Mispagel,*
207 Mo. 557, 106 S. W. 513.

The ownership of the money alleged to have been stolen
was, by the information, laid in the Hardin State Bank,
whereas the evidence tended to show, if it tended to show
anything, an ownership by J. R. Boyd, in a credit. Where a
charge of larceny is made, the ownership of the property stolen
must be alleged and then proved as alleged. (*State* v. *De Wolfe,*
29 Mont. 415, 74 Pac. 1084; *State* v. *Mjelde,* 29 Mont. 490, 75
Pac. 87; *State* v. *Keeland et al.,* 39 Mont. 506, 104 Pac. 513;
*State* v. *Moxley,* 41 Mont. 402, 110 Pac. 83; *State* v. *Van,*
44 Mont. 374, 120 Pac. 479; 8 Ency. of Evidence, p. 136.)

*Mr. L. A. Foot,* Attorney General, *Mr. A. H. Angstman* and *Mr. I. W. Choate,* Assistant Attorneys General, submitted a brief; *Mr. Angstman* argued the cause orally.

We submit that the transfer of this credit by defendant on the books of the bank was actually equivalent to the appropriation of money by the defendant.

The result of the act of appellant was just this: It caused the bank to be exactly $1,500 short in money. The bank still owed Boyd the $1,500 which he had deposited therein and was still liable for its payment. The unauthorized transfer of this money from Boyd's account to the "Transit Account" (in reality to the account of appellant) did not in any way diminish the amount of money which Boyd "had in the bank," to use the popular expression; nor did it extinguish the obligation of the bank to pay to Boyd's order the said sum of $1,500 which still belonged to him. Hence, the bank still owed Boyd the $1,500. Our legislature contemplated that a deposit in a bank or credit is equivalent to money. (Secs. 7429, 7446, Rev. Codes 1921; see *State* v. *Finnegean,* 127 Iowa, 286, 103 N. W. 155; *Territory* v. *Hale,* 13 N. M. 181, 81 Pac. 583; *Mason* v. *State* (Okl. Cr.), 212 Pac. 1028; *People* v. *Leavens,* 12 Cal. App. 178, 106 Pac. 1103; *Fulkerson* v. *State,* 17 Okl. Cr. 103, 189 Pac. 1092; *Bartley* v. *State,* 53 Neb. 310, 73 N. W. 744; *State* v. *Palmer,* 40 Kan. 474, 20 Pac. 270; *State* v. *Krug,* 12 Wash. 288, 41 Pac. 126; *People* v. *McKinney,* 10 Mich. 54.)

It is next contended that there is a variance in the proof as to the ownership of the thing stolen, namely, that the information alleges that the money belonged to the bank, while the proof showed that the money, or credit taken, belonged to Boyd. What was said by the court in *Parker* v. *State,* 75 Fla. 741, 2 A. L. R. 350, 78 South. 980, is decisive of this question. The court in that case said: "Where an indictment lays the ownership of stolen property in one who is its lawful custodian and entitled to its possession, the ownership is sufficiently alleged, and it is not a fatal variance if the proof

shows that the legal title to the property was in some one other than the person in whose possession it was and who had the care and management of it." To the same effect is . *Mathews* v. *State,* 85 Fla. 194, 95 South. 609.

Again, our statute (sec. 11849, Rev. Codes 1921) provides: "When an offense involves the commission of, or attempt to commit, a private injury, and is described with sufficient certainty in other respects to identify the act, an erroneous allegation as to the person injured, or intended to be injured, is not material." (See, also, *State* v. *Moxley,* 41 Mont. 402, 110 Pac. 83; *People* v. *Smith,* 112 Cal. 333, 44 Pac. 663; *State* v. *Harris,* 42 La. Ann. 980, 8 South. 530; *State* v. *Hauser,* 183 N. C. 769, 111 S. E. 349; *Richey* v. *State,* 28 Wyo. 117, 201 Pac. 154, 205 Pac. 304.)

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

While the transactions out of which this prosecution grew were in the making Bert Rarey, the defendant, was vice-president of the Hardin State Bank. On August 26, 1922, his personal account was overdrawn $1,416.97. Upon that day he drew a draft upon one Voorhees, addressed to the First National Bank of Hysham, for $1,500. The draft was sent for clearance through, and was charged upon the books of the Hardin State Bank to, the Montana National Bank of Billings. Contemporaneously the defendant credited his personal account with $1,500. The draft having been returned unpaid, the defendant credited the account of the Billings bank with the amount thereof and at the same time charged the "transit account" of the Hardin State Bank with a like amount. The Hardin State Bank then transmitted the draft to the First National Bank of Hysham for payment, but on September 20, 1922, it came back with $2.50 protest fees attached. Thereupon the defendant, by means of a "debit slip" charged the account of J. R. Boyd, a depositor of the Hardin State Bank with the sum of $1,500, credited the "transit account" with the

same amount, and charged the protest fee of $2.50 to his own account.

On March 12 the defendant was charged by information with the crime of grand larceny. It was alleged: That on or about the twentieth day of September, 1922, the defendant, as vice-president of the Hardin State Bank, "then and there having in his custody, by virtue of his office in said Hardin State Bank, $1,500 lawful money of the United States of America, and of the value of $1,500 lawful money of the United States of America, did then and there willfully, wrongfully, unlawfully, and feloniously appropriate to his own use, take, and steal the sum of $1,500 lawful money of the United States of America, and of the value of $1,500 lawful money of the United States of America, then and there the property of the said Hardin State Bank, a corporation, with intent in him, the said Bert Rarey, to appropriate the same to his own use, and to deprive the true owner of its said property, and to steal the same."

The defendant pleaded not guilty. Trial ensued, as a result of which he was found guilty and judgment was rendered against him. A new trial was denied him. Then he appealed from the judgment and the order denying his motion for a new trial.

Upon the trial it was the state's theory that the crime was committed when the defendant wrongfully charged Boyd's account with the sum of $1,500 which he placed to the credit of the "transit account," thereby covering the amount of the Voorhees draft.

The court instructed the jury: That every person acting as the officer of any bank or corporation, "who secretes, withholds, or otherwise appropriates to his own use, or that of any person other than the true owner, or person entitled thereto, any money, goods, thing in action, security, evidence of debt or property, or other valuable thing, or any proceeds thereof, in his possession or custody, by virtue of his office, employment, or appointment, is guilty of larceny in such degree as is herein prescribed with reference to the value of such

property.'' The foregoing language is a part of section 11382, Revised Codes of 1921. The court added: ''Grand larceny is larceny committed * * * when the property taken is of value exceeding $50.''

The jury was advised: ''In this case you are not concerned with any loss or damage that may have been sustained by J. R. Boyd through the operations of the defendant. The defendant is charged with a larceny of the sum of $1,500, lawful money of the United States of America, from the Hardin State Bank, and, unless you find beyond a reasonable doubt from the evidence in this case that the defendant actually took and appropriated to his own use money belonging to the Hardin State Bank then you must acquit the defendant.''

And also: ''You are instructed that before you can find the defendant guilty you must find from the evidence beyond a reasonable doubt that the defendant actually took and appropriated to his own use lawful money of the United States of America to the amount of $1,500, the property of the Hardin State Bank.''

Now, upon the record, was the defendant guilty of the crime of larceny? That he did not ''actually take'' from the bank $1,500 in money is conceded. But it is said by making the debit and credit entries aforesaid in effect he did steal from the bank that much money.

It was the defendant's contention upon the trial, and is his contention on this appeal, that the evidence introduced by the state was insufficient to justify a verdict of guilty of the offense charged in the information, and that there was a fatal variance between the allegations of the information and the proof introduced by the state.

A brief discussion of some of the fact conditions may be [1] helpful. J. R. Boyd had deposited money with the Hardin State Bank. When he did so he parted with the title to the specific money he deposited; it then became the property of the bank. (*In re Williams' Estate,* 55 Mont. 63, 1 A. L. R. 1639, 173 Pac. 790.) The relation of debtor and creditor then existed between the bank and Boyd. The bank was obligated

to repay him the money upon his demand; he was a general creditor of the bank in that amount. (*Stankey* v. *Citizens' National Bank of Laurel*, 64 Mont. 309, 209 Pac. 1054.) On the morning of September 20, 1922, the bank owed him $1,936.87, and the bank books showed that he had credit in that amount. The books of a bank are simply the means employed by the bank to show the condition of its business. The defendant by debiting Boyd's account $1,500 caused the books to show a credit due Boyd of $436.87 only.

If wrongfully and without authority from Boyd the defendant changed the books to show a less amount due Boyd than Boyd was entitled to the wrongful act did not alter the true condition in the least; the bank still owed Boyd $1,936.87—actually he still had that amount of credit.

The defendant was himself a customer of the bank, maintaining an open account with it. He was prohibited by [2] law from overdrawing his account; by the provisions of section 6055, Revised Codes of 1921, any officer of a bank "who knowingly overdraws his account with such bank, and thereby obtains the money, notes or funds of any such bank" is guilty of a misdemeanor. According to the record the defendant for several weeks prior to August 26, 1922, had been overdrawing his account. It constantly increased day by day until it reached the sum of $1,416.97. But in overdrawing his account in this fashion he was not guilty of larceny; he was simply guilty of a specific crime which the statute made punishable as a misdemeanor. So on August 26 the relation of debtor and creditor existed between him and the bank. He owed the bank $1,416.97. But it is not asserted that he had stolen any of that money.

If the draft which he made upon Voorhees had been paid, it would have wiped out the overdraft. When defendant credited his account with the amount of the draft on August 26, he then had an apparent credit in place of an overdraft on the books. If the draft were dishonored, defendant still would owe the bank $1,416.97. The draft having been returned

through the Billings bank, was again sent to the Hysham bank as we have seen, returning for the last time on September 20. During the period of time between August 26 and September 20 the defendant deposited from various sources which are not questioned, $857.49, but on September 20 his account was again overdrawn $232.77. Without the credit furnished by the Voorhees draft the defendant had considerably increased his overdraft. He had the right to draw checks against his account so long as he had credit (a real credit) upon the books of the bank. When he again overdrew knowingly, he again committed a misdemeanor. It is not asserted that the new overdraft in amount $232.77 affected the situation in any way. It merely increased defendant's indebtedness to the bank.

It was not contended upon the argument, nor is it in the attorney general's brief, that the Voorhees draft was not drawn in good faith; nor is it contended that defendant stole the money he obtained from the checks he drew against his account prior to September 20. As a matter of fact, it seems the president and cashier, as well as the defendant, all were more or less actively engaged in the management of the bank, and there is nothing in the record to indicate otherwise than that the president and cashier acquiesced in, or at least winked at, defendant's continued practice of overdrawing his account.

The debit slip whereby defendant charged Boyd's account with $1,500 came to the attention of the president and cashier on the day it was made. The cashier called it to the attention of the president and the latter spoke to defendant about it. The defendant wrote "O. K." and his name upon the credit slip and no further question was raised concerning it at the time. Undoubtedly the explanation for this is that the president and cashier thought defendant was authorized to make the charge because of the very friendly business and personal relations which they knew existed between the defendant and Boyd.

The debit slip was included with Boyd's canceled checks which were returned to him with his bank statement about October 1. On receipt of the statement Boyd, according to his testimony, called the defendant on the telephone and asked him what the $1,500 debit meant. It is unnecessary to detail the conversation which ensued. It is sufficient to say that the defendant did not attempt to assert that he had made the charge against Boyd pursuant to authority previously granted him, but he did contend that Boyd approved and ratified the transaction during the conversation. Boyd's version of the conversation is not altogether clear, but it may be said that in some measure at least he denied that he had ratified or approved what the defendant had done. Upon this feature of the case the evidence is somewhat in conflict. However, the jury did not accept the defendant's explanation of his purpose and motives in debiting Boyd's account.

The state does not assert that on September 20, before he debited the account of Boyd, defendant was guilty of larceny. These were the conditions then: The defendant was indebted to the bank on account of his overdraft; the books showed his account overdrawn $232.77; if the Voorhees draft and the "transit account" transaction be disregarded, he actually was overdrawn $1,732.77; he owed the bank that much money. Now when he took the $1,500 credit from the Boyd account, which he credited to the "transit account"—in effect to his own—and this without previous or subsequent authority from Boyd, he did not change the bank's indebtedness to Boyd, nor his own to the bank in any degree.

Mr. Skaug, the cashier, in answer to the question, "Do the books and records of the Hardin State Bank show that Mr. Rarey on that date, or at any time, ever took $1,500 of the moneys of the Hardin State Bank?" answered, "No, sir." Further he said: "There was no cash in this transaction; it was a question of credit items. It was the debits and credits of the bank that were changed. The cash account did not

fluctuate by virtue of the accounts being transferred as to debit and credit."

Even if the defendant without authority took from Boyd's account a credit which he applied to his own this did not constitute larceny from the bank. That he injured Boyd may be conceded, but of what did he thereby deprive the bank? True, the bank was liable to Boyd for the $1,500 but its liability in that respect was not changed by what the defendant did. No single act of the defendant after the creation of his overdraft altered or changed the bank's position or injured it in any manner whatsoever, so far as the record discloses.

It is clear that, upon the facts and circumstances in the record the transfer of this credit on the books of the bank did not constitute, nor was it equivalent to, appropriation of money by the defendant. It may be that he willfully misapplied a credit belonging to another (although we have not found any Montana statute constituting such act a crime), and it may be that he made a false entry upon the books of the bank, but neither of these acts is comprehended by the information.

Counsel have discussed the meaning of the term "credit" as defined in section 1996, Revised Codes of 1921; "credits" (*Clark* v. *Maher*, 34 Mont. 391, 87 Pac. 272); "money" and "credits" (*Mason* v. *State* (Okl. Cr. App.), 212 Pac. 1028); and "moneys, funds and credits" as employed in section 5209, U. S. Rev. Stats., being U. S. Comp. Stats., section 9772 (*United States* v. *Smith* (D. C.), 152 Fed. 542), but the discussion has not proved useful in reaching a determination of this case. Indeed, as counsel for defendant says, the case is unusual. Neither side has cited us to a similar case, and we have not been able to find any.

We again call attention to the law which demands that before [3] one may be convicted he must be directly, plainly and specifically charged with the commission of a certain crime and the crime charged must be proved substantially as alleged.

(*State* v. *Keerl,* 29 Mont. 508, 101 Am. St. Rep. 579, 75 Pac. 362; *State* v. *Wallin,* 60 Mont. 332, 199 Pac. 285.)

Not under any theory of the case which it seems permissible to evolve from the fact conditions presented may this conviction based upon this information be allowed to stand. Therefore the judgment is reversed, and the cause is remanded to the district court of Big Horn county with directions to dismiss the information and discharge the defendant.

*Reversed.*

ASSOCIATE JUSTICES HOLLOWAY, STARK and MATTHEWS concur.

MR. JUSTICE GALEN, being absent on account of illness, did not hear the argument and takes no part in the foregoing decision.

Rehearing denied February 26, 1925.