The STATE OF MONTANA, Plaintiff and Respondent, *v.*
LLOYD JAMES NOBLE, Defendant and Appellant.

No. 10533

Submitted March 12, 1963. Decided August 2, 1963.

Rehearing denied September 5, 1963.

384 P.2d 504

Anderson, Symmes, Forbes, Peete & Brown, Weymouth D. Symmes, (argued), Billings, for appellant.

William J. Speare, County Atty. (argued), Billings, Forrest

H. Anderson, Atty. Gen., Donald A. Douglas, Asst. Atty. Gen. (argued), Helena, for respondent.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

Appellant was charged by information with committing first degree murder and first degree assault.

## "COUNT I

"In the District Court of the Thirteenth Judicial District of the State of Montana, in and for the County of Yellowstone, on the 19th day of February A.D. 1962, comes William J. Speare, County Attorney of said county, and here in said District Court, upon his official oath and in the name and by the authority of the State of Montana, informs the Court: That one LLOYD JAMES NOBLE late of the County of Yellowstone, State of Montana, on or about the 16th day of of February, A.D. 1962, at the County of Yellowstone and State of Montana, committed the crime of MURDER, in that the said LLOYD JAMES NOBLE, then and there being, did, then, and there, wilfully, wrongfully, unlawfully, deliberately, feloniously, premeditatedly and with malice aforethought kill and murder one ROSA NOBLE, a human being, then and there being contrary to the form, force and effect of the statute in such case made and provided, and against the peace and dignity of the State of Montana.

## "COUNT II

"That the said LLYOD JAMES NOBLE, on or about the 16th day of February, 1962, at the County of Yellowstone and State of Montana, committed the crime of ASSAULT IN THE FIRST DEGREE, in that the said LLOYD JAMES NOBLE, then and there being, then and there did wilfully, wrongfully, unlawfully and feloniously, with the intent to kill a human being, assault a human being, to-wit: SHIRLEY MAICHEL, with a loaded firearm, to-wit: A Model 722 Remington 257 Roberts Rifle; contrary to the form, force and effect of the

statute in such case made and provided, and against the peace and dignity of the State of Montana."

This information arose out of events that occurred on February 16, 1962. On that evening the appellant went to the home of Mr. and Mrs. Elmer Maichel where his divorced wife lived and worked as a housekeeper for the Maichels and their two children. After being admitted and talking to Mr. Maichel for a few minutes, during which time no conversation took place with the two women, he started to go outside saying, "I'll be right back." The testimony reveals that he only opened the door sufficiently to reach outside to get a rifle that he had placed just outside the door, and when he came back into the room he pointed it at his ex-wife Rosa who was seated on a couch with Mrs. Maichel in the living room. At this point Mrs. Maichel first saw the gun and shouted "Oh God, he has a gun" or words to that effect. He immediately commenced firing hitting Rosa. Mr. Maichel, at his wife's exclamation, had run to a bedroom to get a pistol and when he returned he found the appellant struggling with Mrs. Maichel. He tried to shoot the appellant but the pistol jammed, and during the time it took to clear the pistol, the appellant shot Mrs. Maichel in the arm, hit her in the head with the butt of the rifle, and shot her twice while she lay on the floor. He tried twice after that to shoot Mrs. Maichel as she lay on the floor, but the gun was empty. Mr. Maichel had returned and he again tried to shoot the appellant. This time he succeeded in wounding the appellant in the arm before the gun jammed again after which the two men struggled, with Mr. Maichel finally overcoming the appellant.

There is little dispute on the evidence as to the commission of the two crimes. The police were at the scene within minutes of its occurrence and made a complete investigation of the physical facts. In addition, they took appellant into custody and got both Mrs. Maichel and the appellant to the hospital for medical aid. While at the hospital waiting for surgery one of the officers, Lt. Ness, took a statement from the appel-

lant to the admission of which the appellant has taken exception.

The background of the two families are necessary to reveal the events that lead to this tragedy, and to fully understand the defense. The two families had previously lived in Harrison, Montana, in Madison County and had been friends.

The Maichels had married in 1953 and were the parents of two boys. They became acquainted with Rosa Noble in 1957. According to Mrs. Maichel in the summer of 1959 the appellant tried to get her to go out with him one evening. She refused. Within a few months after this took place rumors were circulated about the small community that there was an "unnatural relationship" existing between the two women, Mrs. Noble and Mrs. Maichel. These rumors became so bad that the Maichel marriage nearly broke up. As a result of the rumors and a threat of the appellant, Mrs. Maichel left the town of Harrison, and within months Mr. Maichel sold his business and the family rejoined him in Billings. There they sought out the counseling of Dr. Theodore Chemodurow, a local psychiatrist, who assisted them in re-establishing their home. As will be noted later this same doctor had treated the appellant and had also tried to counsel the appellant and his wife prior to their divorce.

The appellant was born in 1921. In 1942 he enlisted in the Marine Corps and participated in the battle of Tarawa and the campaigns of Saipan and Okinawa. Shortly after the battle of Tarawa he was hospitalized and his medical records show that he was treated for mental illness, the first diagnosis being "psychosis—manic depressive", but that after several weeks of treatment this diagnosis was changed to "combat fatigue". He went back to duty, served in two more campaigns, and received an honorable discharge. As a result of his service he drew 30 percent disability, psychoneurotic reaction, anxiety and neurasthania, based on his mental condition that was determined to be service connected. After leaving the service he returned to Montana, took over the family ranch and appears to have suc-

cessfully run it for a number of years. He married and at the time of the crime had three children, two boys and a girl. In 1951, due to mental stress his brother-in-law took him to Mount Airy Sanitarium in Denver, Colorado, for treatment where his doctor diagnosed him to be suffering from schizophrenia. He was given shock treatments and treated for two weeks and discharged as having apparently recovered, though the clinical report stated "prognosis must be somewhat guarded in view of the short duration of therapy and hospitalization."

In September 1959 he was treated at the Veteran's Hospital at Fort Harrison, Montana, by Dr. Crowley, the resident psychiatrist. There his diagnosis was: Psychoneurotic reaction, —anxiety and neurasthenia. Competent. He was put on tranquilizers, and referred to Dr. Theodore Chemodurow of Billings for out-patient treatment. Dr. Chemodurow treated him 12 to 14 times and diagnosed him to be a paranoid schizophrenic. These treatments were in the later months of 1959. Dr. Chemodurow also saw Mrs. Noble at one session, but she was an unwilling patient and did not return. The Nobles were divorced in the summer of 1960 and the appellant got custody of the children. He moved over to Stevensville and from the evidence it appears that he had a difficult time caring for his family, eventually having to board his daughter out though he kept the two boys. Mrs. Rosa Noble eventually went to Billings where she hired out to the Maichels to baby sit and take care of their home in Billings. All of these facts seem to confirm, in the mind of the appellant, the fact that there was a relationship between the women, and upon them he focused all of his difficulties. He blamed Mrs. Maichel for breaking up his home. On the day of the shooting the appellant had driven down to the Yellowtail Dam project seeking work, no jobs were available so he returned to Billings. In his statements the appellant said: "I had been thinking all the way from Hardin about all the trouble this deal had caused me and my children and I made up my mind before I arrived in Bil-

lings that I was going to Elmer Maichel's house and kill his wife, and my ex-wife Rosa. I had my 257 Roberts Rifle with me in my pickup—I usually carry it with me when I travel." As has been previously stated that is just what he did, though he only wounded Mrs. Maichel instead of killing her.

One week after the shooting, the defendant, with his attorney, appeared in court and entered a plea of not guilty to each of the counts in the information and the case was set for trial on May 7, 1962. At the time set for trial, May 7, 1962, a jury was picked and testimony was taken from Drs. Hughett and Harr as to the defendant's competency to stand trial, and the jury found "the defendant, Lloyd James Noble, incompetent at this time, and unable to stand trial." The defendant was committed to the Montana State Hospital at Warm Springs on May 9, 1962.

The following letter concerning defendant was received by the county.

"MONTANA STATE HOSPITAL

"Warm Springs, Montana

"June 20, 1962

"Mr. William J. Speare
"County Attorney
"Yellowstone County
"Billings, Montana

"Re: NOBLE, LLOYD JAMES

"Dear Mr. Speare:

"This patient entered Montana State Hospital May 10, 1962, pursuant to District Court Order 6363, Thirteenth Judicial District, for care, custody and treatment until restored to competency and declared sane and able to stand trial.

"The patient, on June 1, 1962, was re-evaluated in a hospital clinic meeting and it was recommended he be returned to the jurisdiction of the court.

"He was again examined by the undersigned, June 20, 1962, with also an opinion that he has recovered, and is competent

to stand trial. It is further my opinion that he is able to participate in his defense.

"Would you please request, or arrange for the sheriff of Yellowstone County to take him into custody at his convenience?

"Sincerely yours,

"s/John G. Freeman, M. D.

"Superintendent

"KGF/mlm

"cc: Yellowstone County Sheriff

"Dr. Gracia"

On July 25, 1962, defendant was returned to the County to stand trial. The trial began on September 10, 1962, and ended on September 13, 1962, when it went to the jury who returned a verdict of guilty on both charges, some twenty hours after submission of the case to them.

The appellant has assigned thirteen specifications of error. It is unnecessary to consider each specification separately due to the fact that some of the specifications involve the same general questions of law. We will therefore group them into six groups, each covering a general legal question.

The first group covers the court's two instructions on insanity, Nos. 30 and 38 and whether the court erred in giving them and in refusing defendant's proposed instructions 28, 34, 38 and 39. In so refusing these instructions the defendant claims that his basic defense of irresistible impulse at the time of the crime was destroyed.

Court's Instructions 30 and 38 covering excusable insanity are as follows:

"INSTRUCTION NO. 30

"Insanity in the criminal law is any defect, weakness, or disease of the mind rendering it incapable of entertaining or preventing it from entertaining in the particular instance the criminal intent which constitutes one of the elements in every crime, and if the defendant had not sufficient reason to be able to judge of the consequence of his act, or was so far deprived of

volition or self-control by the overwhelming violence of mental disease that he was not capable of voluntary action and therefore not able to choose the right and avoid the wrong, he was not responsible for any act committed by him while in this condition.''

"INSTRUCTION NO. 38

"You are instructed that if from all the evidence in the case you believe beyond a reasonable doubt that the defendant committed the crimes of which he is accused, in manner and form as charged in the information, and that at the time of the commission of such crimes the defendant knew that it was wrong to commit such crimes and was mentally capable of choosing either to do or not to do the act or acts constituting such crimes and of governing his conduct in accordance with such choice, then it is your duty under the law to find him guilty, even though you should believe from the evidence that at the time of the commission of the crimes he was not entirely and perfectly sane.''

While the defendant objected to the giving of the instructions he admits in his brief that they are a proper restatement of our law, but that they needed further explanation of the so-called "irresistible impulse" theory which any one of his four proposed instructions would have corrected. The trial judge held that the above-quoted instructions were sufficient to include this theory of the case.

Here the district judge followed the admonition of this court in the case of State v. Narich, 92 Mont. 17, 9 P.2d 477, where the court said:

"* * * In the trial of such cases in the future, district courts are admonished to make their instructions to juries as plain and simple as possible, and to avoid numerous instructions on the subject, as too many given are confusing and serve no useful purpose. *One or two given in the ordinary case should be sufficient.*" Emphasis supplied.

In State v. Peel, 23 Mont. 358, 59 P. 169, 75 Am.St.Rep. 529,

this court not only adopted the general theory of the M'Naghten Rule, but the court went somewhat further in that it broadened the M'Naghten rule to include the doctrine of "irresistible impulse" but limited this rule to insane persons.

The M'Naghten Rules evolved from the M'Naghten Case, Clark & Finnelly, 201, 8 Eng.Rep. 718 (Ch. 1843), wherein the defendant, one Daniel M'Naghten, was tried for the murder of Sir Robert Peel's private secretary. The defendant was laboring under an insane delusion that he was being hounded by his enemies and that Peel was one of them. The defense made was insanity, and the jury found him "not guilty, on the ground of insanity". Accordingly, five questions were put to the fifteen judges of England regarding the law of insanity, and from their answers the "right-wrong" rules or M'Naghten Rules are constituted. These Rules in effect lay down as a criterion for determining insanity the test of whether the accused at the time of the doing of the act knew the difference between right and wrong with respect to the act with which he is charged.

Under the Peel case, supra, even if the defendant had the capacity to distinguish between right and wrong, he could still be found not guilty if he could establish that he acted under an irresistible impulse. However, the court, quoting from Wharton's Cr.Law, § 45, limited the irresistible impulse application to insane persons saying " 'the law makes all sane persons responsible for their impulses' ".

This court has never determined whether by the application of the right and wrong test, insanity is determined, or whether insanity must first be determined, and then the right and wrong test applied to measure the degree of insanity which renders a man subject to "irresistible impulse."

Since the Peel case the court has labored with this two-headed monster in vain to bring it into proper focus. In State v. Keerl, 29 Mont. 508, 75 P. 362, the court seemed to say it was a question for the jury. There they held that giving separate jury instructions on the right and wrong test are in irreconcilable

conflict with others based on that test as modified by the irresistible impulse test and that the court erred in giving instructions based on different theories, and on a different state of facts. This seems to mean that the court recognized both doctrines, but took the position that one set of facts cannot support an instruction on each test separately, but approved the reasoning and result reached in State v. Peel, where Chief Justice Brantly said such instructions were not contradictory. The majority went further in the Keerl case saying:

"The question whether the defendant in any case was affected with insanity to such a degree as will excuse him from the commission of an act which would be criminal if done by a sane person is *one of fact;* it certainly is not a question of *law.*" Emphasis supplied.

The next case State v. Crowe, 39 Mont. 174, 102 P.579, seems to hold that instructions based on the right and wrong test and the irresistible impulse test are not inconsistent.

In State v. Colbert, 58 Mont. 584, 194 P. 145, the court followed State v. Peel, supra, allowing the jury to find irresistible impulse although not specifically instructed on it by the court.

Following the Colbert case, the court next considered the question in State v. Narich, 92 Mont. 17, 9 P.2d 477. Here again the doctrine of the Peel case is adopted and there the court referred to what it believes to be the settled law concerning these doctrines. The court in the Narich case, quoting from State v. Keerl, supra, said:

" '* * * the question whether the defendant, when he committed the act for which he is on trial, had the mental power to entertain a criminal intent, and did entertain it, can be reached best by submitting to the jury a test founded solely upon statute. * * * The question for determination being, was the defendant, when he committed the act, sane, or affected with insanity? * * * The jury may determine the fact [of insanity] from the testimony adduced before it, no matter what may be the character of the insanity attributed to the defend-

ant. This includes * * * insane delusions and insane irresistible impulses.' " This case has been cited and followed by State v. Simpson, 109 Mont. 198, 95 P.2d 761, and State v. Kitchens, 129 Mont. 331, 286 P.2d 1079. See also Kitchens v. United States (10th Cir., 1959) 272 F.2d 757.

Having reviewed this court's position on instructions which cover the M'Naghten Rule and irresistible impulse, can we say that the two instructions of the instant case which have been herein set out before, follow this position? As pointed out in State v. Narich, supra, an instruction such as the instant case, No. 38, standing alone is confusing, and unless No. 30 cured it, the jury was not properly instructed.

At the time of defendant's submission of his Instructions the court refused proposed No. 28 on "irresistible impulse" saying:

"I do think that he has the right to have irresistible impulse more clearly defined so they will understand the nature of the confession and act charged. However, I believe it is fully covered."

█ Having just gone over the State's Instructions he must have been referring to what became court's Instruction 30. While some 12 instructions on insanity were given in the Narich case covering insanity, and court's Instruction 30 was one of them, the court, in the Narich case, supra, pointed out, as previously quoted, that the giving of too many instructions on insanity was "confusing and serve no useful purpose. One or two given in the ordinary case should be sufficient." We observe that the district judge followed the Narich opinion in limiting his Instructions and did not err. Instruction 30 sets forth the basic "right and wrong" test for insanity referred to as the M'Naghten Rule. Instruction 38 sets forth the further test under the doctrine of State v. Peel, supra, which is that a defendant who might not be freed from blame under the M'Naghten Rule may yet be found not criminally responsible if it is shown that while he had sufficient reason to distinguish right from wrong that he was not mentally capable of choosing to avoid

the wrong and govern his conduct in accord with such choice.

The second group covers whether or not the court's refusal to grant defendant's proposed Instructions 28, 34, 37 and 38, which are as follows, was error.

"28. You are instructed that irresistible impulse is an impulse growing out of some mental disease so that the person afflicted, while able to understand the nature and consequences of the act charged against him and to perceive that it is wrong, is unable, because of such mental disease to resist the impulse to do it. It is to be distinguished from mere passion or overwhelming emotion not growing out of, and connected with a disease of the mind. Frenzy arising solely from the passion of anger or jealousy, regardless of how furious, is not insanity."

"34. You are instructed that insanity in the criminal law is any defect, weakness, or disease of the mind, rendering it incapable of entertaining or preventing its entertaining in the particular instance the criminal intent which constitutes one of the elements of every crime. When one who commits an act which would be criminal if done by a sane person does not know the difference between right and wrong, or, knowing the difference between right and wrong, is mentally unable to refrain from doing the wrong, he is unable to form a criminal intent and cannot be guilty of crime. In such event, in this case, your verdict must be not guilty by reason of insanity."

"37. In determining the question whether the defendant was insane at the time of the alleged commission of the offenses charged in the Information the jury is to consider all of his acts at the time of, before, and since the commission of the alleged crimes, as such acts and conduct have been shown by the evidence, and the jury should consider the defendant's appearance and actions at the time of, before and after the alleged commission of the offenses, and if the jury is satisfied from a preponderance of the evidence that at the time the defendant shot and killed the deceased, he was so affected in his mind and memory that he was not able to distinguish right and wrong

and had no knowledge and understanding of the character, quality and consequence of his acts or as a result of a diseased mind did not have the mental power and the will to abstain from them, then he was not legally responsible for any acts then committed by him; and you should find him not guilty by reason of insanity."

"38.  You are instructed that, assuming that the defendant's knowledge of the nature and quality of his act and his knowledge that the act is wrong, if by reason of disease of the mind, the defendant has been deprived of, or lost the power which would enable him to prevent himself from the doing of the act, then he cannot be found guilty."

As previously set forth, in considering court's Instructions 30 and 38, additional instructions were unnecessary, and therefore the failure to give further instructions was not error.

The third group sets forth an appeal to this court to abandon the M'Naghten Rule, broadened by this court to include the theory of "irresistible impulse" as to insane persons, and to adopt either the so-called "Durham Rule", see Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430, or the "Currens Rule" as set forth in United States v. Currens, 3 Cir., 290 F.2d 751, in this case and to all future cases where the defense of insanity has been raised.

In the instant case, considerable evidence was introduced by the defendant regarding his sanity and mental condition. The evidence consisted of testimony of psychiatrists, institutional reports and military medical records. This evidence presented to the jury the question of sanity or insanity, that they finally determined. The instructions were patterned after State v. Peel, 23 Mont. 358, 59 P. 169, supra, and subsequent cases.

Admitting the great divergence of views on the subject, and recognizing the desirability of putting to rest any question as to this court's position, the author of this opinion has read numerous articles in legal publications, medical and scientific journals relating to the commonly called M'Naghten Rule, Dur-

ham Rule, Currens Rule and that proposed by the American Law Institute. There is an abundance of authority to substantiate any of the Rules or any compromise between them. In addition, the numerous legal opinions concerning the Rules have been carefully considered.

Since its announcement in 1954, the rule of the Durham case has not been adopted in a single state adhering to the M'Naghten Rule, and the most recent decisions expressly reject both the Durham Rule and the proposed American Law Institute rule, and reaffirm M'Naghten, Dare v. State (Okl.1963), 378 P.2d 339; State v. White, (Wash.1962), 374 P.2d 942; Chase v. State of Alaska, (Ala.1962), 369 P.2d 997; Newsome v. Commonwealth, (Ky.1963), 366 S.W.2d 174; State v. Poulson, 14 Utah 2d 213, 381 P.2d 93. While we are not controlled by the number of court cases of other jurisdictions on the question we do believe that they are most persuasive under present day circumstances.

Here the court's instructions embodied both the M'-Naghten Rule as broadened by this court's inclusion of the so-called "irresistible impulse" test and adequately protected the defendant. Having reviewed the authorities, both legal and scientific, we are unwilling at this time to abandon the established position of this court having found nothing better that would justify a change.

The fourth consideration set forth as error is that the court erred in permitting the state to ask a hypothetical question of Dr. Bruce Hughett in the form in which it did. The question reads as follows:

"Q. Assuming that the medical history of the person to be as it was given you by Lloyd J. Noble, assuming that the following facts relating to the crime be true, namely, on February 16th, a man drove to Hardin, Montana, to seek employment; that while leaving Hardin enroute to Billings, Montana, he formed an opinion, or I should say, formed an intent to kill his ex-wife and another person; that he comes to Billings; that

he parks his car a half block from the scene of the crime; that he carries a gun to the house in question, places it outside of the door; that he enters the house; that when he entered the house, he sits and talks clearly, coherently to the people in the house; subsequently he steps from the house, picks up the gun, re-enters the house and starts in shooting; that there is a struggle in the course of this incident, and in which his gun was taken away from him, then surrenders to the authorities. *I left out some of the remarks that perhaps you are familiar with. And also assume those facts with relation to this question,* based on these facts, and assuming those facts to be true, have you an opinion as to whether or not such a person would be able to distinguish between right and wrong at the time of the commission of the act?

"Mr. Symmes: Before you answer, I am going to object on the ground it is in improper form, doesn't state any facts which he can take into consideration, and he is asking the doctor to base his opinion upon facts that in his own words, none of us know about the—

"The Court: Overruled, you may answer.

"A. I think he should have been able to know right from wrong, should have been able to refrain from the wrong and adhere to the right."

While it is the settled law in Montana that hypothetical questions must be framed by each side to support its theory of the case fairly reflecting all the vital facts, this court held in State v. Crowe, 39 Mont. 174, 102 P. 579, that "The authorities appear to be practically unanimous in holding that a hypothetical question need not embrace all of the evidence respecting the defendant's mental condition."

A medical witness, qualified as an expert may give his opinion based upon knowledge obtained and facts observed by him in treating or examining the accused. Underhill's, Criminal Evidence, (5th ed.), § 461.

The defendant's contention that it "doesn't state any

facts which he can take into consideration, and he is asking the doctor to base his opinion upon facts that in his own words, none of us know about" is not entirely accurate. Dr. Hughett had interviewed defendant three times and had available to him his medical records. It would appear that the objection does not go to his lack of knowledge, but to the doctor's alleged knowledge not communicated to the jury. All of the facts set forth in the hypothetical question had previously been testified to directly, or through medical records unless possibly minor facts which are unimportant. The fairness of a hypothetical question is largely a matter resting in the discretion of the trial court, whose rulings thereon will not be a ground for reversal in the absence of a showing of an abuse of discretion. While the question was not a model for future law students the court did not abuse its discretion and properly permitted the question. State v. Peel, 23 Mont. 358, 59 P. 169, supra; State v. Crowe, 39 Mont. 174, 102 P. 579; Townsend v. City of Butte, 41 Mont. 410, 109 P. 969; De Sandro v. Missoula Light, etc., Co., 52 Mont. 333, 157 P. 641; State v. Rivenburgh, 11 Utah 2d 95, 355 P.2d 689; State v. Grapper (Missouri App. 1959), 328 S.W.2d 633.

Concerning defendant's fifth grouping of alleged error with reference to the court's failure to give defendant's Instruction No. 44, covering what the court could do in the event defendant was found not guilty, in inquiring into defendant's sanity, we find the court did not err. This instruction anticipated comment by the prosecutor in his summation. In State v. Simpson, 109 Mont. 198, 95 P.2d 761, this court held that it was not error for the prosecutor to comment in final argument on the fact that defendant if acquitted would walk out of the court a free man. So, even if the prosecutor had in his summation made such a comment, and the record does not disclose that he did, the court's refusal of the instruction would have been correct under the existing opinion of this court. No

prejudicial error having been shown the court's ruling on the instruction was correct.

Referring now to the sixth grouping of alleged error made by the defendant concerning two confessions introduced during the trial. The first confession was taken at the hospital, approximately one hour after the shooting, where the defendant had been taken to be treated for wounds received around his head and the bullet wound in his arm. The only evidence submitted concerning treatment and medication was produced by the State's witness. Two police officers, Aukshun and Kilwein, were involved in the apprehension of the defendant and took him to the hospital to have his wounds treated. Aukshun later saw him in the emergency room and Kilwein was with him for about three hours. Neither of these officers testified as to who cared for the defendant's wounds, what treatment was given, and if any sedative was used, what kind it was.

The third State's witness, Lt. Ness, was the man who took both confessions from the defendant via the question and answer method and he wrote out the defendant's statement in a narrative fashion, submitting it each time to the defendant for his signature. There is no testimony, nor does the defendant allege any irregularities in the methods used by Lt. Ness in securing the statement. The defendant was warned each time of his constitutional rights, no promises were made, no threats were made and the statements were witnessed by a third party. So far as the record before us shows they were completely voluntary on the part of the defendant. After being reduced to writing the first statement was handed to the defendant who according to Lt. Ness started reading it, but handed it back to Lt. Ness and said: "You read it" because his eyes were either blurry or hazy. Lt. Ness read it and the defendant signed it. Lt. Ness was asked by counsel for the defendant, "Do you know whether or not the defendant was under drugs at the time?" He replied, "I checked with the head nurse on the floor and was advised that he had received some sedation approximately

an hour before my interview." As to this first confession there was no showing as to who treated the defendant or as to what sedation was used, nor were any hospital records submitted to show what had been administered. Lt. Ness testified that the defendant was rational, cooperative, and appeared to understand the nature of what was being done and his answers to questions were logical.

Concerning the second confession taken two days later at the hospital, Lt. Ness gave the reason for taking same that in discussing the first confession with the county attorney's office they felt the question of the sedation made it desirable to get the second confession. When he went to the hospital to talk to the defendant, Lt. Ness said the defendant recognized him and that he checked with the nurse and found out no sedation had been administered to the defendant within an hour and a half or longer; thaat he again properly warned the defendant of his rights, and again he took a statement that was more complete and detailed than the first statement. After Lt. Ness reduced the statement to writing, the defendant read it aloud to Lt. Ness and two witnesses and signed it. To the introduction of the first confession counsel for defendant objected "On the ground it deprives the defendant of the due process of provisions of the Fourteenth Amendment." He was overruled. To the introduction of the second confession he made the same objection and was overruled.

The question of the admissibility of a confession which was obtained while the defendant was allegedly under the influence of a sedative given for the treatment of a wound is a matter of first impression in this court. However, numerous other states have decided this question and may be looked to for guidance.

This court held in State v. Berberick, 38 Mont. 423, 100 P. 209, that a confession taken down in writing, but not in confessor's exact language, by signing it and adopting its language makes it his own.

The defendant cites for his authority in ruling out the first confession three cases. State v. Graffam, 202 La. 869, 13 So.2d 249; Edwardson v. State, 255 Ala 246, 51 So.2d 233, and Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948. All three of these cases are clearly distinguishable on the facts and are not controlling in this case. In State v. Graffam, supra, the defendant was seriously wounded and evidence was introduced that he was under morphine at the time of the confession. The facts in Edwardson v. State, supra, show that the confession came after constant coercion and repeated interrogation of a woman who was ill and to whom the city physician had given narcotics to alleviate the pain. In Reck v. Pate, supra, the United States Supreme Court said: "The question in each case is whether a defendant's will was overborne at the time he confessed."

As to the first confession a doubt existed as to whether or not defendant was under sedation so the second confession was obtained. There is no contradiction between the first and the second confession. The only difference is that the second is more detailed than the first. The authorities cited by defendant deal with cases in which a narcotic was administered, no such question is raised here, where only a sedative was given. Accepting the fact that some sedative had been administered within an hour before the first confession does not *ipso facto* make it inadmissible. The necessary element to determine is whether at the time of the confession it was made voluntarily and of his free will. See People v. Waack, 100 Cal.App.2d 253, 223 P.2d 486; People v. Grasso, 142 Cal.App.2d 407, 298 P.2d 131; People v. Russo, 168 Cal. App.2d 747, 336 P.2d 628; People v. Lane, 56 Cal.2d 773, 16 Cal.Rptr. 801, 366 P.2d 57.

Assuming arguendo that the first confession was obtained while defendant was subject to sedation, there are no facts therein related which do not appear in the second confession, which the record clearly shows defendant read, understood and signed. If the foundation for the admission of the

first confession be deemed insufficient, its admission was merely cumulative and we fail to perceive any prejudice that could result to defendant in view of his later or second confession.

In summation, the weight of the evidence in a criminal matter is for the jury to determine in the first instance. If the circumstances reasonably justify the verdict, this court must assume existence of every fact which the jury could have reasonably deduced from all the evidence to reach its verdict.

During the course of a complicated trial, such as this was, both sides in the heat of trial make certain errors. It is the duty of this court to ascertain whether or not the errors are prejudicial for only upon such errors may a case be returned to the district court for retrial. Having carefully examined each alleged specification of error set forth by the defendant we find no prejudicial error and affirm the judgment of the district court.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICE CASTLES concur.

MR. JUSTICE ADAIR:

I concur in the result but not in all that is said in the foregoing majority opinion.

MR. JUSTICE DOYLE:

I dissent.

Perusal of the reasoning in the majority opinion would seem to turn on that hoary and frequently misused theory of law of *stare decisis*.

Analysis of the record and the Montana decisions in this case deprives the majority of sanctuary of that legal haven of justification for the decision herein.

From the very inception of appellate courts in this nation, when a substantial and fabulous miscarriage of justice occurred, the Bar would facetiously refer to such decision "as the best guess of the court of ultimate conjecture."

*Stare decisis* is ordinarily a wise rule of action, but on the contrary it is not a universal, exorable command.

It does not, without a single exception, command that we err again when we are confronted with the problem of passing on some theory of law steeped in antiquity that is obviously erroneous, as is presented here. The many and varied facts of both law and modern physchiatry, which began with the rule in the M'Naghten case, Clark & Finnelly, 201, 8 Eng.Rep. 718 (Ch.1843), cannot now be applied in the instant cause.

The better modern scientific forces and the force of better reasoning, cognizant of the process of trial and error, so salient in our advanced knowledge of medical sciences, is appropriate also in the judicial function.

Justice demands that this fact be recognized.

Our state government is potent, the omnipresent teacher. For good or ill, it teaches the whole people by example. Crime, as such, is contagious. If the State becomes a lawbreaker, it breeds contempt for the law; it invites every man to become a law unto himself; it invites anarchy. To declare, as here that in the administration of justice the end justifies the means—to declare that the State may ignore the obvious to procure the conviction of one mentally incompetent would bring terrible retribution to all the citizens of Montana. The greatest dangers to justice in the courts of this State lurk in the insidious encroachment by men of zeal, well-meaning, but without understanding.

The conviction of the defendant in the trial court resulted partially from the contradictory evidence of the State's psychiatrist. There will appear in this dissent further comment on these so-called experts.

The "expert" witness appeared in the late 18th Century in English Jurisprudence. Prior to that time they were not deemed necessary as their function was fulfilled, perhaps not too adequately by the jurors, who were impaneled for the express purpose of using their own knowledge in particular cases, being selected by reason of that knowledge. Thus, a question of the

quality of leather in litigation was decided by a jury of tanners.

Jurors cannot be a board of psychiatric assessors who can decide between doctor witnesses on the basis of which is more medically correct; they are not in a position to evaluate and grade experts for marks of proficiency or lack of it.

The jury was never aware of the motives of experts, three of whom testified and the other did not take the witness stand, this being Dr. Freeman, whose letter of June 20, 1962, triggered this trial.

It has been well said that a jury cannot be instructed to find a defendant guilty beyond *all* reasonable doubt, as to do this would arrogate to man a certainty which can belong to God alone.

Conversely, if a jury is not completely instructed as to the law of the case, the twelve citizens become a painted ship on a painted legal ocean devoid of both a point of departure and destination, unaided by any legal navigational aids or compass courses, tossed about by the winds of ignorance, speculation, conjecture and suspicion. Ultimately they arrive in that harbor of erroneous "wrong verdict" abhorred by everyone, which operates to deprive the accused of his paramount constitutional right to which he is entitled, "Justice under the law".

Having been the law of Montana for many years, what possible confusion would have resulted in the minds of the jurors, had the trial court given, as he should, defendant's proposed Instruction No. 28, quoted on page 14 of the majority opinion. State v. Peel, 23 Mont. 358, 59 P. 169; State v. Keerl, 29 Mont. 508, 75 P. 362; State v. Narich, 92 Mont. 17, 9 P.2d 477.

The jury who spent twenty agonizing hours in returning their verdict of "Guilty" were entitled to this Instruction, and above and beyond this fact, was the clarion and strident requirement that this mentally confused defendant be not denied his basic right of a fair trial by the refusal of this vital statement of Montana law.

After the law had changed to the present obligation of jurors, as sole triers of the facts presented to them as evidence, it then became necessary to call expert witnesses by one or both sides of the cause.

It was and is the duty of an "expert" to give an honest, forthright opinion, as here presented, on medical and psychiatric subjects, of which they are presumed to have qualifications to pronounce.

The author of a monograph on the "Law of Evidence" makes this statement. "Expert witnesses have a tendency to espouse the cause of the party by whom they are called." This statement seems especially true of Dr. Hughett, who after testifying in the first instance that Lloyd J. Noble was incompetent, then completely reversed himself and became immovably tenacious that the defendant was competent.

The machinery of the law, such as is recited in the majority opinion is not a tribute to civilized restraint of our knowledge of psychiatry, but on the contrary, represents a melancholy reversion to the year of 1843. It is repugnant to the thought of our modern day knowledge and instincts.

Two psychiatrists, Dr. Donald L. Harr and Dr. Bryce G. Hughett found the defendant mentally incompetent, by letters in writing dated May 4, 1962 and May 7, 1962, and again under oath. Dr. Bryce G. Hughett testified the defendant had a disordered mind, and he was the psychiatrist for the State and a partner of Dr. Harr.

"PSYCHIATRIC EXAMINATION

"Name: Noble, Lloyd   Sex: Male   Age: 40 years

"Date of Exam 5-4-62

"An additional psychiatric evaluation was made on this date to determine the patient's present mental status in preparation for a hearing scheduled in District Court on May 7. Mr. Noble was aware of the scheduled hearing and stated that he is in favor of having a hearing to get matters straightened out and 'clear things up'. He wants 'them' to know there were reasons

for what he did and that he had to do what he did. He said
that he is 'not crazy', but he can understand how he would be
mentally ill from the pressure he has been under. By the term
mentally ill the patient was referring to being 'nervous'. He
then went on to explain some of the pressures which he had
felt saying, 'That Maichels woman is tough and smart and
shrewd, but she is the one who is crazy. I had her covered with
that gun and she called for a loaded gun. She was going to
kill me. Those homosexuals will do that if you break up their
picnic. I think she used that gun to force Rosa to stay away
from me and the children. Those queers are shrewd and crazy
(at this point the patient described an experience he had while
in the service when some man apparently made a homosexual
approach toward him). She had already gone through 5 or 6
women before she finally got one that was sick.' He then ex-
plained that his wife was more 'mentally ill' than he was after
she had the mumps and the surgery to remove an ovary. The
patient said that he did not mind going to a hospital if that
was what was decided was best, but he added that there is still
danger in this valley with his being here and with Shirley Mai-
chels being here. He feels that something still is apt to happen
that would be of danger to the entire valley. He added again
that he is not crazy and that he knows that I can understand
what he is talking about. He related that he had explained this
to my 'friend' (referring to an interview with Dr. Bryce Hugh-
ett on the previous day).

"The patient's ideation and behavior at this time continued
to demonstrate delusional thinking of his own omnipotence and
special powers. He is in general aware of what is happening
around him, but he misinterprets the significance of circum-
stances and his situation. He does not appear to accept the seri-
ousness of the situation in which he is involved because he feels
that he has adequate explanation for everything that has hap-
pened, as well as having special powers to see that everything
will turn out the way he wants it to. At the same time there

appears to be some underlying depression with the patient's not caring to a reasonable degree in regard to what happens to him. He openly denies that he is 'crazy' even though this might be considered as a defense upon which he could rely under his present circumstances.

"It is my impression that these findings indicate the presence of a schizophrenic reaction, paranoid type, with the patient not adequately comprehending the seriousness of the situation in which he is involved. Hospitalization for treatment of this illness is recommended. It should be noted that the patient has a 30% service connected disability with the Veterans Administration for the diagnosis of psychoneurosis, so that he would be eligible for hospitalization in a Veterans Administration Hospital for any psychiatric condition.

"/s/ Donald L. Harr, M.D."

Exactly forty-three days later, Dr. Freeman, in charge of the State Mental Hospital at Warm Springs wrote the following letter to the County Attorney of Yellowstone County:

"Mr. William J. Speare

"County Attorney

"Yellowstone County

"Billings, Montana

"Re: NOBLE, Lloyd James

"Dear Mr. Speare:

"This patient entered Montana State Hospital May 10, 1962, pursuant to District Court Order 6363, Thirteenth Judicial District, for care, custody and treatment until restored to competency and declared sane and able to stand trial.

"The patient, on June 1, 1962, was re-evaluated in a hospital clinic meeting and it was recommended he be returned to the jurisdiction of the court.

"He was again examined by the undersigned, June 20, 1962, with also an opinion that he has recovered, and is competent to stand trial. It is further my opinion that he is able to participate in his defense.

"Would you please request, or arrange for the sheriff of Yellowstone County to take him into custody at his convenience?

"Sincerely yours,

"/s/ John G. Freeman, M.D.

"Superintendent

JGF/mlm

cc: Yellowstone County Sheriff

    Dr. Gracia"

Keeping in mind the authenticated history of mental confusion of the defendant for nineteen years as is hereafter recited in this opinion, curiosity is aroused as to the exact treatment and method by which Dr. Freeman reached his conclusions of the defendant's competency, in these few short days. It could only have been achieved by the application of physiognomy, phrenology or necromancy. It was and is medically impossible for Dr. Freeman or anyone else to examine, treat and cure the defendant within this short period of time and attain the degree of competency stated in his letter, and to blandly refute the unbiased competent opinions of the psychiatrists over the years since 1944.

It can be fairly stated that if this final opinion of Drs. Freeman and Hughett is true, then the world has again reverted to the age of miracles. Predicated on personal experience of many years, the writer, being a realist, finds a motive, that possesses no theological implication.

Dr. Glueck in Mental Disorder and the Criminal Law at page 354 states:

"The recovery rate in schizophrenic cases is extremely low. It (schizophrenia) may lead to almost any conceivable crime."

Dr. MacNiven in Mental Abnormality and Crime at page 19 states:

"Schizophrenia is a very serious illness. In the majority of cases recovery does not occur and many of the cases end in a state of profound dementia."

It is statutory law that neither the prosecution nor defense

is required to call all of their witnesses. Yet the record discloses that Dr. Freeman was present in court during the trial but was not called as a prosecution witness. Why?

To bring into the focus of the reader the history of the defendant, Lloyd James Noble, as a living person, and not a pawn of expert psychiatric differences, the personal history insofar as pertinent will be recited.

The defendant was born at Dillon, Montana, on November 12, 1921. On November 5, 1942, he enlisted in United States Marine Corps at Butte, Montana, and it is interesting to note that he certified to the following:

"I hereby certify that I have never been subject to fits, fainting spells, or a victim of bed-wetting." He participated in the battle of Tarawa and the campaigns of Saipan and Okinawa. It is noteworthy that defendant's mental difficulty commenced immediately after his first combat experience. The defendant after being honorably discharged from the Marine Corps returned to his ranch near Harrison, Montana, where he married Rosa Noble and three children were born to the issue of this marriage.

In June of 1960, the defendant and the deceased were divorced and a part of the decree provided that the deceased, Rosa Noble, would have the children for nine months and the defendant three months. The deceased, Rosa Noble, never exercised the legal right to have the care, custody and possession of the three children, but on the contrary moved in with a Shirley Maichel and this record is rampant with allusions to an unnatural, Lesbian attachment between the deceased, Rosa Noble, and Shirley Maichel.

To clarify the psychiatric definitions that appear in this record, reference is made to the American Illustrated Medical Dictionary, (21st ed.), written by Dr. W. A. Newman Dorland.

The first definition is that of *remission* and is defined as "A diminution or an abatement of the symptoms of a disease; also the period during which diminution occurs." There is in the

annals of psychiatry many documented cases of remission wherein the confused person is as normal during this period as any other individual.

The next word to be defined is that of *schizophrenia*. "Bleuler's term for dementia praecox which, according to his interpretation presents a cleavage or fissuration of the mental functions."

*Schizoid* is defined as, "Resembling schizophrenia: a term applied by Bleuler to the shut-in, unsocial, introspective type of personality and by Kretschmer to the physical type resembling that of persons with dementia praecox."

*Dementia praecox,* the word *dementia* means "A generic designation for mental deterioration" and *praecox* is the "term for a large group of psychoses of psychogenic origin, often recognized during or shortly after adolescence but not infrequently in later maturity. The chief characteristics are disorientation, loss of contact with reality, splitting of the personality."

*Paranoia,* "A chronic, *slowly progressive mental disorder* (personality disorder) characterized by the development of ambitions or suspicions into systematized delusions of persecution and grandeur which are built up in a logical form."

*Delusion,* "A false belief which cannot be corrected by reason. It is logically founded and cannot be corrected by argument or persuasion or even by the evidence of the patient's own senses."

*Delusion of persecution,* "A morbid belief on the part of a patient that he is being mistreated, slandered, and injured by secret enemies."

*Hallucination,* "A sense perception not founded upon objective reality", thus an *auditory hallucination* is "the hearing of unreal sounds."

*Psychosis,* "Formerly a generic name for any mental disorder. Specifically the deeper, more far-reaching and prolonged behavior disorders such as *dementia praecox* and manic-depressive."

*Manic depressive,* "An essentially benign, affective psychosis, chiefly marked by emotional instability, striking mood swings, and a tendency to recurrence. It is seen in the manic, depressed, circular, mixed, perplexed and stuporous types."

It is now incumbent upon the writer to set out in some detail the psychiatric history of the defendant beginning with his admission to the Marine Hospital on January 15, 1944, at the age of 22 and just subsequent to the Battle of Tarawa. The defendant was in the Marine Hospital for a period of nineteen days and the diagnosis was "psychosis, manic depressive." Lt. Comdr. R. G. Vaughan, a psychiatrist of the United States Navy, elicited from the defendant these delusions "There is going to be an overthrow of our government starting as a race riot from motion pictures or four or five other plans, its going to be centered by a capitalist in Montana and a Hollywood—they are going to knock out the Army, Navy and Marines. There is nothing like perpetual motion. Every plant has a magnet, a circuit, iron mountains of Mexico, etc. Believes he is a prophet and foretells the future, always studied how nature works, has found out what makes livestock mean. He is voluble and rambling, denies hallucination, denies delusions of persecution." Again, "On the same day this man [meaning Noble] shows flight of ideas increasing for the past two weeks." On January 15, 1944, he was transferred to the 75th Station Hospital and further transferred to the United States Naval Hospital.

On June 13, 1951, the defendant submitted himself voluntarily to Mt. Airy Sanitarium at Denver, Colorado, where he underwent six electric shock treatments. The diagnosis at that institution was schizophrenia. Dr. Carlson of the Sanitarium elicited this story of mental confusion from the defendant.

"He has been working very hard, getting up at daylight and working until dark. He has been worried about the world situation. 'I've got it figured out. The Russians are going to hit us on July 27th. They can burn the fields then. They can knock us out in twelve hours. Their attack will start at 11:00 P.M.

I predicted stuff in Hawaii. I'm a prophet. There is a tunnel from a volcano in Mexico that runs through North America.'" He further stated to Dr. Carlson that "everything is in a pattern of two, they are in section two, two south two east. He has been to rooms that have two in them. Joining service at 20; was in the second corps. His brother was in a second wave, died in the second hour. He talks about a geodetic survey mark which has a number of two's in it."

While the record does not concisely disclose it, it would appear that the defendant had been examined at Fort Harrison Veteran's Hospital for rating purposes and his last examination for that purpose was on May 2, 1958, and he was receiving a service connected disability of 30% for phychoneurotic reaction. On September 8, 1959, he submitted himself to this hospital for admission and was examined by Dr. Leo S. Crowley, a psychiatrist at that institution. Dr. Crowley made these observations.

"His answers and volunteered statements contain much in the way of irrelevant detail. Sometimes he is quite vague and evasive in responding to direct questions. He says he has had his recent severe nervous difficulties since the earthquakes. It seems that he is almost as badly shaken as the Madison Canyon. He says he has had disaster follow him under previous circumstances and in different localities. He says that each time he has escaped from danger and bodily injury when others have not. When he talks, about these things he becomes quite involved and circumstantial. He says he is sure that further disasters are going to occur in the Western United States. He thinks that the next disaster is going to be an immense tidal wave which will destroy the Pacific Coast completely. He says he knows about these things going to happen through dreams, things he has read through practical knowledge and experience. He injects much from the Bible and Masonry into his speech about his experiences and feelings. * * * He feels that he has worried and thought so much about the earthquakes

that he does not know what to do about it or for himself. He now brings up numerous references to the figure 'two.' He says he is the second child in his family; a brother who went in on the second assault move on Iwo Jima was killed; it took him two hours to die from hemorrhage; he was buried at Iwo Jima and a second time in Bozeman. He is actually obsessive—compulsive regarding the number two. * * * He attaches great significance to the triangle also. * * * The triangle formed by an association which exists between the veteran [Noble], his wife, and another woman. The relationship with the other woman is not between he and she but between she and his wife. He says that his wife and the other woman are together almost constantly and he suspects the relationship between them may physically be homosexual in nature. * * *

"Diagnosis. Schizophrenic reaction, undifferentiated type, in partial remission, formerly diagnosed psychoneurotic reaction anxiety and neurasthenia. * * * Incapacity: severe."

Prior to the time of seeking admission to Fort Harrison Veterans Administration Hospital, the defendant was admitted to St. Vincent Hospital at Billings on February 10, 1958, and was discharged on March 21, 1958. While in this institution he received twelve electro-sleep under insulin. This treatment according to medical authority is a drastic type of treatment for mental confusion. While at St. Vincents he was given a final diagnosis of a psycopath with a neuropsychiatric reaction with reactive depression and the diagnosis of hospitalization was recommended for the defendant.

On June 1, 1961, the defendant submitted himself to Dr. H. Ryle Lewis, who placed him in St. Patricks Hospital in Missoula, Montana. There he underwent four electric shock treatments while in the hospital and three thereafter on June 12, 14, 16, of 1961. Dr. Lewis made a diagnosis of schizoid reaction,—recurrent. Dr. Lewis further stated that the defendant was defintely psychotic.

Mention should be made of Dr. Theodore Chemodurow, a

psychiatrist residing in Billings, who saw the defendant in his professional capacity on September 10, 1959, and between September 10, 1959, and October, Dr. Chemodurow saw the defendant twelve or fourteen times, and as the result of this examination extending over a period of perhaps nearly two months, Dr. Chemodurow testified that in his opinion, the defendant Noble, was a paranoid schizophrenic. The Doctor further testified that he discussed the defendant with Mrs. Maichel. The Doctor was asked this question:

"Q. And did she, [meaning Mrs. Maichel] ask your opinion as to whether Lloyd was dangerous? A. Yes, she did.

"Q. Did you give them an opinion? A. Yes.

"Q. What did you say to them? A. I told them he was dangerous, and that they should stop the relationship. If he didn't see them together there wasn't anything to worry about but as he told them in no uncertain terms I told them they should believe what he said, and stating that if there was no end of this relationship going on.

"Q. And that if this relationship continued, it was dangerous, is that right? A. That is right. They repeated what he said and I agreed with them. He said, as I recall, he would do some kind of bodily harm to either one or both."

This testimony of Dr. Chemodurow was flatly denied, under oath, by Mrs. Maichel.

The Doctor was further asked this question:

"Q. Yes. Would it be your opinion that at the time of this killing or shooting, this incident, that the defendant did not know whether his acts are right or wrong? A. At the time he did not know that his acts were wrong. * * *

"Q. All right, it is your opinion, that at this time, that he had no conscious knowledge of his acts at the home of the Maichels here in Billings, is that your opinion? A. Yes.

"Q. Doctor, can you describe to me what irresistible impulse is? What your understanding of it is? A. Going back to the example of that pressure cooker, I would say that with the pres-

sure built up to a certain level, the irresistible impulse would be the explosion and the reaction; that once it gets to a degree of pressure there is nothing that can happen except explosion and disintegration of the container.

"Q. That is what you consider then to be irresistible impulse in that pressure cooker. A. In the light of this example."

The majority opinion can find slight solace in citing State v. Narich, 92 Mont. 17, 9 P.2d 477, which case quoting from State v. Keerl, 29 Mont. 508, 75 P. 362, admonished the district courts to make their instructions to the jury as plain and simple as possible. Let us quote that paragraph in its entirety:

" '* * * The jury may determine the fact from the testimony adduced before it, no matter what may be the character of the insanity attributed to the defendant. This includes, of course, *insane delusions and insane irresistible impulses.'* In our opinion, the defendant was in no manner prejudiced by the giving of the instruction complained of, in view of the other instructions of the court given, elaborating on the subject. In the trial of such cases in the future, district courts are admonished to make their instructions to the juries as plain and simple as possible, and to avoid numerous instructions on the subject, as too many given are confusing and serve no useful purpose. One or two given in the *ordinary* case should be sufficient."

Section 94-7201, subd. (5), R.C.M.1947, reads:

"When the instructions have been passed upon and settled by the court, and before the arguments of counsel to the jury have begun, the court shall charge the jury in writing, giving in such charge only such instructions as are passed upon and settled at such settlement. In charging the jury, the court shall give to them *all matters of law which it thinks necessary for its information in rendering a verdict.*" Emphasis supplied.

In State v. Narich, supra, the court gave the identical instruction which here appears as Instruction 38. The court in the Narich case observed: "This instruction is somewhat con-

fusing, but it must be considered in connection with, and in the light of, other instructions given by the court on the subject without objection." The court further instructed in the Narich case "that insanity, in the criminal law, is any defect, weakness or disease of the mind rendering it incapable of entertaining, or preventing its entertaining, in the particular instance, the criminal intent which constitutes one of the elements of every crime. "In all, the court in the Narich case gave twelve instructions covering the defense of insanity including insane delusions, and insane irresistible impulses. The court in the Narich case, 92 Mont. at page 24, 9 P. 2d at page 479, further observed:

"Returning now to a consideration of the instructions given by the court to the jury on the question of the defendant's alleged insanity, with these settled principles of law before us, it will be seen that the instructions given to the jury in this case fully and fairly present the law applicable to the evidence, although instruction *No. 26, standing alone, would be objectionable.*" Emphasis supplied.

In the instant cause, the trial court gave no instruction that would cure the misleading statement of the law that appears in Instruction No. 38. On the contrary, the next instruction, No. 39, reads as follows:

"You are instructed that if you find beyond a reasonable doubt that the defendant, Lloyd James Noble, did wilfully, wrongfully, unlawfully, premeditatedly, and with malice aforethought, did kill Rosa Noble, and you find at the time of such killing the defendant, Lloyd James Noble, was not insane as elsewhere in these instructions defined, then you must find the defendant guilty of murder in the first degree."

The only difficulty with this instruction is the failure of the trial judge to elsewhere correctly define irresistible impulse.

In State v. Rolla, 21 Mont. 582, 55 P. 523, the court, there speaking on the question of instructions, stated:

"* * * it is held that when conflicting propositions of law

are given upon a material point, one correct and the other incorrect, the judgment will be reversed. It cannot be assumed in such case that the jury will follow the correct statement of the law. The court, as a general rule, cannot give all the law in a single instruction, and therefore the instructions must be considered all together; and, when so considered, they must correctly state the law, without contradiction."

In State v. Brooks, 23 Mont. 146, 57 P. 1038, the court said:

"The true principle, therefore, is that the state must prove guilt beyond a reasonable doubt, and if, upon the whole evidence, no matter whether the state or defendant offers such evidence, the jury have a reasonable doubt whether, when defendant killed the deceased, he was sane or insane, it is their duty to give the defendant the benefit of the doubt and to acquit him."

In view of the foregoing, one is at complete loss to understand the theory upon which Instruction No. 38 was given to the jury in the instant cause without other curative and explanatory instructions, and particularly an instruction on irresistible impulse.

This lengthy dissent is written for the express purpose of pointing up the fact that this was not an ordinary case and further that the defendant's offered Instruction No. 28 covering irresistible impulse was not given and this case should be reversed on that ground if for no other reason.

Again adverting to the defendant's proposed Instruction No. 28, in the case of State v. Espelin, 106 Mont. 231, 76 P.2d 629, this court stated:

"The instructions given were of more than usual length and appear to cover every conceivable phase of the crime of which the defendant was charged. Under the established rule, the instructions must be considered as a whole, Russell v. Sunburst Refining Co., 83 Mont. 452, 72 P. 998; State v. Colbert, 58 Mont. 584, 194 P. 145, and, so considered, we think the instructions eminently fair to the defendant. When the instructions as a

*whole* correctly state the law error does not exist. State v. Brooks, 23 Mont. 146, 57 P. 1038."

At page 292 in the majority opinion, this statement appears:

"While the defendant objected to the giving of the instructions he admits in his brief that they are a proper restatement of our law, but that they needed further explanation of the so-called 'irresistible impulse' theory which any one of his four proposed instructions would have corrected. The trial judge held that the above-quoted instructions were sufficient to include this theory of the case."

The majority opinion at page 508 having by strained reasoning concluded that the trial court ruled that instructions were sufficient to include "irresistible impulse" then at page 511 aggravates this highly debatable matter by making this statement:

"Here the court's instructions embodied both the M'Naghten Rule as broadened by this court's inclusion of the so-called 'irresistible impulse' test and adequately protected the defendant."

While the trial court gave 51 instructions to this jury the only two instructions given the jury relating to insanity was court's Instruction No. 30 and court's Instruction No. 38; neither of these two instructions contained at any place in their context the words "irresistible impulse" or the definition of the same. See State v. Peel, 23 Mont. 358, 59 P. 169; State v. Keerl, 29 Mont. 508, 75 P. 362; State v. Narich, 92 Mont. 17, 9 P.2d 477.

Advert to the hypothetical question expounded to Doctor Bryce Hughett, the prosecution witness, which question appears in the majority opinion. It is however, important to again quote a part of the question.

"*I left out some of the remarks that perhaps you are familiar with. And also.assume those facts in relation to this question,* based on these facts, and assuming those facts to be true, have you an opinion as to whether or not such a person would be

able to distinguish between right and wrong at the time of the commission of the act?" Emphasis supplied.

The jury were entitled to know all of the facts in evidence upon which the State's expert arrived at his opinion.

The majority rely upon State v. Crowe, 39 Mont. 174, 102 P. 579, and recite, "The authorities appear to be practically unanimous in holding that a hypothetical question need not embrace all of the evidence respecting defendant's mental condition."

What the majority opinion did not incorporate in State v. Crowe, supra, was this holding of the court:

"In putting the hypothetical question to the expert they had a right to assume as established, for the time being, *all the facts in evidence tending to support their theory.* It was a legitimate inference from the evidence, under this theory, that the defendant retained a grudge against the deceased, and that, prompted by a desire to gratify his feelings of revenge, he lay in wait for the opportunity to strike the fatal blow. It was for the jury to say, *after considering all the evidence introduced by both sides,* whether the facts, thus assumed as established for the time being, *were really established,* and whether the opinion of the witness was worthy of consideration."

It might be observed that State v. Crowe was reversed and remanded by this court and additionally that the Crowe opinion cites the case of State v. Peel, 23 Mont. 358, 59 P. 169. The statement, that the hypothetical question need not embrace all the evidence respecting defendant's mental condition, appears in State v. Peel, supra, in the following language:

"Counsel were not compelled to so frame their question as to embrace in it a statement of all the elements of the law of insanity." Emphasis supplied.

In Underhill's Criminal Evidence, (5th ed.) § 461, we find this statement:

"The opinion which is expressed by the expert must be positive in form and character. If he cannot or will not give such

an opinion his doubts that the accused was sane or his conjectures that he was insane, must be rejected."

In a dissenting opinion in the case of People v. Jackson, 10 N.Y.2d 510, 225 N.Y.S.2d 200, 180 N.E.2d 561, it was said:

"Defendant's objection and motion for mistrial at this point were improperly overruled and denied. Thereafter, in his charge, the court compounded the error of receiving this testimony by charging that Dr. Winkler 'examined the defendant on three occasions shortly after the alleged crime and found that he was capable of understanding the nature of the charges and proceed with the defense'—an issue wholly irrelevant, and its admissibility forbidden by statute. The fact that no exception was taken to this erroneous charge does not preclude us from considering its prejudicial effect in this capital case.

"In view of the foregoing serious errors, consisting of the exclusion of evidence and the allowance of inadmissible and highly prejudicial testimony with respect to the major issue in the case—defendant's alleged insanity, it is unnecessary for us to discuss the clear inconsistency of Dr. Winkler's testimony and other errors urged upon us by the defendant.

"The judgment of conviction should be reversed and a new trial ordered."

As early as December 1, 1902, in the case of Raub v. Carpenter, 187 U.S. 159, 23 S.Ct. 72, 47 L.Ed. 119, the United States Supreme Court held as follows:

"He was then asked the following questions:

" 'Doctor, have you formed any opinion, from your uncle's general condition of health and the conditions disclosed by his brain at this investigation, *and from all you know about him yourself,* what his condition of mind was?'

"To that portion of the question which called for an opinion from the witness from 'all that you know about him yourself' the caveatees objected on the ground that no sufficient basis had been laid for that portion of the question, and that the facts relied upon in this particular should be first adduced.

The court sustained the objection and caveators preserved an exception.

"We agree with the court of appeals that the trial court did not err in holding that portion of the question objectionable, and, if so, the question as framed could not properly have been allowed to be propounded, though caveators were left free to put it with the objectionable words omitted. *Clearly, the opinion of the witness from facts he did not disclose was inadmissible*. If he knew anything about the deceased other than what he had stated, which aided him in arriving at a conclusion, that knowledge should have been developed. In that particular the question *assumed the existence of facts* for which there was no foundation in the evidence."

Again from Underhill's Criminal Evidence, (5th ed.) § 462, we find the following:

"* * * the expert for the state who is appointed, or who is requested by the prosecuting attorney to examine the accused for the purpose of ascertaining his sanity, should conduct himself in a *fair* and *impartial manner* during the examination. He need not tell the accused the purpose of the examination but the fact that he does so, asking the accused to be open and free with him, but that he need not tell him anything that would incriminate him does not exclude the evidence secured by the expert. Such a statement is not a promise on the part of the physician that he will not testify against the accused, and he may testify to any fact ascertained by him or admitted to him, even though he has not warned the accused that his statements made on the examination may be used against him. The jury are never concluded by the report of examiners to the effect that the accused is insane. The evidence of such examiners is merely that of experts and *its credibility is for the jury.*" Emphasis supplied.

Unless the jury were mind readers in the instant cause, they could not possibly know the remarks that Dr. Bryce Hughett was perhaps familiar with, in arriving at his second opinion.

In a volume titled Physchiatry and the Law by Manfred S. Guttmacher, Chief medical officer for the Supreme Bench of Baltimore, Maryland, we find the following at page 406.

"The legal and scientific soundness of the M'Naghten Case Rule has been the subject of endless debate. Almost every phrase has been subjected to both legal and psychiatric criticism. Psychiatrically the most important criticisms that have been advanced are (1) that the questions and answers are intended to cover only cases of psychosis characterized by delusion—the judges knew that the questions referred to the case of M'Naghten, a paranoid individual, with a fairly circumscribed delusional system; (2) the answers were premised upon the psychopathological notions which only remotely conform to present day psychiatric conceptions; (3) concepts of 'right' and 'wrong' belong to ethics—mental disorder cannot easily be interpreted in terms of its influence on ethical knowledge."

One of the most vocal of the present day phychiatric critics, Dr. Gregory Zilboorg, recently said in an address:

"To force a psychiatrist to talk in terms of ability to distinguish between right and wrong and of legal responsibility is —let us admit openly and frankly—to force him to violate the Hippocratic Oath, even to violate the oath he takes as a witness to tell the truth and nothing but the truth, to force him to perjure himself for the sake of justice. For what else, if not perjury, if a clinician, speaks of right or wrong, and criminal responsibility, and the understanding of the nature and the quality of the criminal act committed, when he, psychiatrist, really knows absolutely nothing about such things, when they are presented to him in terms of a hypothetical question, based on legal assumptions and hypothetical psychiatry * * *. It is quite obvious that the immoral, paradoxical situation has become more and more acute in the course of the past twenty-five years, during which we have learned more about psychopathology than during the previous century and a half."

In United States ex rel. Smith v. Baldi, (3rd Cir., 1951), 192

F.2d 540, Chief Justice Biggs, 3rd Circuit Court of Appeals, speaking for himself and two other members of the court dissenting in this case, said: "The law, when it requires the psychiatrist to state whether in his opinion the accused is capable of knowing right from wrong, compels the psychiatrist to test guilt or innocence by a concept which has almost no recognizable reality."

The majority opinion in the instant case sets out *in haec verba* the court's Instruction No. 38 and this author would like to quote the last part of that Instruction.

"\* \* \* that at the time of the commission of such crimes the defendant knew it was wrong to commit such crimes and was mentally capable of choosing either to do or not to do the act or acts constituting such crimes and of governing his conduct in accordance with such choice, *then it is your duty under the law to find him guilty,* even though you should believe from the evidence that at the time of the commission of the crime he was not entirely and perfectly sane."

This instruction is substantially the M'Naghten Rule, and by its very phraseology the trial court tells the jury to find this defendant guilty, even though he be insane. A fair reading of the instruction, above-quoted, compels one to arrive at that final conclusion.

To again emphasize the M'Naghten Rule is a matter of social policy, legally too narrow, and it is medically unsound. In the instant cause, a fair instruction to the triers of the fact, namely the jury, should be phrased in this approximate language.

"A person is not criminally responsible for an act if at the time of the commission of such act, as a substantial consequence of mental disorder, he did not have adequate capacity to conform his conduct to the requirements of the law which he is alleged to have violated."

This suggested instruction is substantially the instruction given and the rule propounded in United States v. Currens (3rd Cir., 1961), 290 F.2d 751.

In 1954, the United States Court of Appeals from the District of Columbia, in Durham v. United States, 94 U.S. App. D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430, enunciated a new rule, which is that "an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect."

The author does not advocate the adoption of the Durham Rule in Montana, and while not critical of the structural validity of the test itself, there is concern as to the operation of the judicial rules of evidence under which the test is applied. In the District of Columbia, the defendant has the burden of raising the issue of sanity there producing "some evidence in that regard" and the quantum of evidence necessary to raise such an issue is slight. After the defense has introduced "some evidence" of insanity, the burden shifts to the prosecution to prove beyond a reasonable doubt the defendant was sane when he committed the act charged. The prosecution must prove beyond a reasonable doubt that (a) defendant was not suffering from mental disease or mental defect, or (b) if he was, the act was not the product of that mental disease or mental defect.

Additionally in the District of Columbia, a verdict of not guilty by reason of insanity does *not* represent an affirmative finding by the jury that the defendant was in fact insane. It simply means that the government has failed to sustain its burden of proof. I cannot agree that society should be exposed to an individual who is dangerously and criminally insane.

This is a dissenting opinion. I regret the necessity I have felt resting on me, of differing with my brothers in this case. I further regret what I conceive to be a solemn duty to express my views so much at length. On a question of less importance, I would not have done so.

I have feared, and still fear, that the effect of sustaining blindly the purportedly rule in the M'Naghten case will continue a legal evil that has existed since 1843 and is present here.

I would be remiss in my duty if I failed to suggest a substitute for M'Naghten Rule.

In Parsons v. State, 81 Ala. 577, 2 So. 854, Mr. Justice Somerville had this to say in the year 1886, when an insanity defense was interposed: "First. Was the defendant at the time of the commission of the alleged crime, as a matter of fact, afflicted with a *disease of the mind,* so as to be either idiotic, or otherwise insane?

"Second. If such be the case, did he know right from wrong, as applied to the particular act in question? If he did not have such knowledge, he is not legally responsible.

"Third. If he did have such knowledge, he may nevertheless not be legally responsible if the two following conditions concur:

"(1) If, by reason of the duress of such mental disease, he had so far lost the *power to choose* between the right and wrong, and to avoid doing the act in question, as that his free agency was at that time destroyed;

"(2) And if, at the same time, the alleged crime was so connected with such mental disease, in the relation of cause and effect, as to have been the product of it *solely.*"

Had the jury in the instant cause have been thus instructed, the defendant Noble would not sit and vegetate in the Deer Lodge prison but on the contrary would be confined and given medical help in some institution for the mentally confused.